UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____

THE CITY OF INEZ, )
a Political Subdivision of )
the Commonwealth of Kentucky )
 )
Plaintiff, )
 )
v. ) CIVIL ACTION NO. _____
 )
AMERISOURCEBERGEN DRUG )
CORPORATION; )
CARDINAL HEALTH, INC.; )
McKESSON CORPORATION; )
PURDUE PHARMA L.P.; PURDUE )
PHARMA, INC.; THE PURDUE FREDERICK )
COMPANY, INC.; TEVA )
PHARMACEUTICAL INDUSTRIES, LTD.; ) **COMPLAINT**
TEVA PHARMACEUTICALS USA, INC.; )
CEPHALON, INC.; JOHNSON & JOHNSON; ) Complaint for Public Nuisance; Violations
JANSSEN PHARMACEUTICALS, INC.; ) of Racketeer Influenced and Corrupt
ORTHO-MCNEIL-JANSSEN ) Organizations Act (RICO) 18 U.S.C. § 1961
PHARMACEUTICALS, INC. n/k/a JANSSEN ) et seq.; KRS 506.120; Negligence;
PHARMACEUTICALS, INC.; JANSSEN ) Negligence Per Se; Violation of Kentucky
PHARMACEUTICA INC. n/k/a JANSSEN ) Consumer Protection Act, KRS 367.110 et
PHARMACEUTICALS, INC.; ) seq.; False Statement in Advertising, KRS
ENDO HEALTH SOLUTIONS INC.; ) 367.170;
ENDO PHARMACEUTICALS, INC.; )
ALLERGAN PLC f/k/a ACTAVIS PLC; )
WATSON PHARMACEUTICALS, INC. n/k/a )
ACTAVIS, INC.; NORAMCO, INC. ) JURY TRIAL DEMANDED
WATSON LABORATORIES, INC.; )
ACTAVIS LLC; ACTAVIS PHARMA, INC. )
f/k/a WATSON PHARMA, INC.; )
MALLINCKRODT LLC; )
MALLINCKRODT, PLC; and )
INSYS THERAPEUTICS, INC., )
 )
Defendants. )
_____ )

# I. PRELIMINARY STATEMENT

1.      Plaintiff, Inez, Kentucky, a political subdivision of the Commonwealth of Kentucky (hereinafter referred to as "Plaintiff" or "Inez"), provides essential services for its citizens and residents, including law enforcement, emergency medical assistance, services for families and children, public assistance, public welfare, and other care and services for the health, safety and welfare of its citizens and residents. The rising numbers of people addicted to opioids have led to significantly increased costs, as well as a dramatic increase of social problems, including, but not limited to, drug abuse and the commission of criminal acts to obtain opioids.[1]

2.      Opioids include brand-name drugs like Oxycontin and Percocet, as well as generic drugs like oxycodone and hydrocodone.  These drugs are derived from or possess properties similar to opium and heroin, and, as such, they are highly addictive and dangerous.

3.      Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.[2]

4.      Plaintiff brings this civil action to recover damages from the Defendants, who are manufacturers and distributors of opioids, and to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate the nuisance caused thereby, and to recoup monies that have been spent, or will be spent, because of Defendants' false, deceptive and unfair marketing and unlawful diversion and distribution of prescription opioids.

---

[1] As used herein, the term "opioid" or "opioids" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

[2] See Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

## II. PARTIES

### A.    Plaintiff

5.    Inez, Martin County, Kentucky is a political subdivision of the Commonwealth of Kentucky.  As such, it has all of the expressed and inherent powers granted by the Constitution of the Commonwealth of Kentucky, and the laws of the Commonwealth of Kentucky.

6.    In Inez, opioid abuse, addiction, morbidity and mortality has created a  serious public health and safety crisis, is a public nuisance, and the diversion of opioids into the illicit market causes or contributes to this public nuisance.

7.    The distribution and diversion of opioids into Inez created the foreseeable opioid crisis and public nuisance for which Plaintiff seeks relief.

8.    Plaintiff has sustained economic damages as a direct and proximate result of Defendants' conduct as alleged herein. Categories of past and continuing damages include, but are not limited to; (1) costs associated with law enforcement and public safety relating to the opioid epidemic: (2) costs for providing emergency services, medical care, therapeutic care, and other treatments for patients suffering from opioid-related addiction or disease, including  overdoses and deaths; (3) costs for prescription drug purchases; and (4) such other costs as may be proven in this litigation.

9.    Plaintiff also seeks the means to abate the opioid epidemic created by Defendants' wrongful  and/or unlawful conduct. Plaintiff is authorized by law to abate any nuisance and prosecute any person or entity who creates, continues or contributes to such nuisance, and to prevent injury and annoyance from such nuisance.

10.    Plaintiff has standing to bring this action and recover damages incurred as a result of Defendants' acts and omissions.

### B.     Manufacturer Defendants

11.     At all relevant times, certain Defendants named below packaged, distributed, supplied, sold, placed into the stream of commerce,  labeled, described, marketed, advertised, promoted, and purported to warn, or purported to inform prescribers and users regarding the benefits and risks associated with the use of the  prescription opioid drugs. These Defendants (the "Manufacturer Defendants") manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

12.     PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware.  PURDUE PHARMA INC. is a New York corporation with its principal place of business  in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue").

13.     Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS  Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the United States. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual nationwide  sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold  from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire  market for analgesic drugs (painkillers).

14.     CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer,  Pennsylvania. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an  Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation which is registered to do business in Kentucky and is a wholly owned subsidiary of Teva Ltd. in Pennsylvania. Teva USA acquired Cephalon in October 2011.

15.     Cephalon, Inc. manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the United States. Actiq has been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies  who are already receiving and who are tolerant to around-the-clock opioid therapy for the  underlying persistent cancer pain."[3] Fentora has been approved by the FDA only for the  "management of breakthrough pain in cancer patients 18 years of age and older who are  already receiving and who are tolerant to around-the-clock opioid therapy for their  underlying persistent cancer pain."[4] In 2008, Cephalon pled guilty to a criminal violation  of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs, and agreed to pay $425 million.[5]

16.     Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to  market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and  marketing activities for Cephalon in the United States through Teva USA and has done so since its  October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and  Fentora as Teva products to the public. Teva USA sells all former Cephalon branded  products through its "specialty medicines" division.  The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses  that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to  report adverse events.

---

[3] *Highlights of Prescribing Information, ACTIQ (fentanyl citrate) oral transmucosal lozenge, CII* (2009), https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020747s030lbl.pdf.

[4] *Highlights of Prescribing Information, FENTORA (fentanyl citrate) buccal tablet, CII* (2011), https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021947s015lbl.pdf.

[5] Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to   Resolve Allegations of Off-Label Marketing (Sept 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

17.     Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.[6] Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 – the year immediately following the Cephalon acquisition – attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including inter alia sales of Fentora.[7] Teva Ltd. operates in  the United States through its subsidiaries Cephalon and Teva USA. The United States is  the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015.  Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva  USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. Teva  Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are  referred to collectively as "Cephalon."

18.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal  place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New  Brunswick, New Jersey. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now  known  as  JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation registered to do business in Kentucky with its principal place of business in Titusville, New  Jersey. JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS,  INC., is a Pennsylvania corporation with its principal place of  business in Titusville, New Jersey. J&J is the only company that owns more than 10% of  Janssen Pharmaceuticals' stock, and corresponds

---

[6] *E.g.*, ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left) (last visited Aug. 21, 2017).

[7] Teva Ltd., Annual  Report (Form 20) 62 (Feb. 12, 2013), http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2012.pdf.

with the FDA regarding Janssen's products.   NORAMCO, INC. is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of Johnson & Johnson until July 2016. Noramco, Inc. is or had been part of Johnson & Johnson's opium processing by making active pharmaceutical ingredients ("APIs") for opioid painkillers.

19.     Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. Janssen  Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen  Pharmaceutica, Inc., and J&J are referred to as "Janssen."

20.     Janssen manufactures, promotes, sells, and distributes drugs in the United States, including  the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion  in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

21.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of  business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation registered  to do business in Kentucky with its principal place of business in Malvern, Pennsylvania.  Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to collectively as "Endo."

22.     Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana  ER, Percodan, Percocet, and Zydone, in the United States. Opioids made up roughly $403  million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012.  Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its  subsidiary, Qualitest

Pharmaceuticals, Inc.

23.    ALLERGAN PLC is a public limited company incorporated in Ireland with its principal  place of business in Dublin, Ireland. ACTAVIS PLC acquired ALLERGAN PLC in March  2015, and the combined company changed its name to ALLERGAN PLC in January 2013. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in  October 2012, and the combined company changed its name to Actavis, Inc. as of January  2013 and then ACTAVIS PLC in October 2013. WATSON LABORATORIES, INC. is a  Nevada corporation with its principal place of business in Corona, California, and is a  wholly-owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson  Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is registered to do  business with the Kentucky Secretary of State as a Delaware corporation with its principal  place of business in New Jersey and was formerly known as WATSON PHARMA, INC.  ACTAVIS LLC is a Delaware limited liability company with its principal place of business  in Parsippany, New Jersey. Each of these defendants is owned by ALLERGAN PLC,  which uses them to market and sell its drugs in the United States. Upon information and  belief, ALLERGAN PLC exercises control over these marketing and sales efforts and  profits from the sale of Allergan/Actavis products ultimately inure to its benefit.  Allergan PLC, Actavis PLC, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc.,  Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are  referred to collectively as "Actavis."

24.    Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs  Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States.  Actavis acquired the rights to Kadian from King  Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

25.    MALLINCKRODT, LLC is a limited liability company organized and existing

under the  laws of the State of Delaware and licensed to do business in Kentucky. Mallinckrodt, LLC  is a wholly owned subsidiary of MALLINCKRODT, PLC. Mallinckrodt, PLC and Mallinckrodt,  LLC are referred to collectively as "Mallinckrodt."

26.     Mallinckrodt manufactures, markets, and sells drugs in the United States including Exalgo, Roxicodone, and generic  oxycodone, of which it is one of the largest manufacturers. In July 2017 Mallinckrodt  agreed to pay $35 million to settle allegations brought by the Department of Justice that it  failed to detect and notify the DEA of suspicious orders of controlled substances.

27.     INSYS THERAPEUTICS, INC. ("Insys") is a Delaware company with its principal place of business in Chandler, Arizona.  Insys manufactures, promotes, sells, markets, and distributes opioids such as Subsys in the United States.

**C.     Distributor Defendants**

28.     At all relevant times, certain Defendants named below distributed, supplied, sold, and  placed into the stream of commerce the  prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors   to detect and warn of diversion of dangerous drugs for non-medical purposes. These Defendants (the "Distributor Defendants") failed to comply with federal and/or state law.  Plaintiff alleges the unlawful conduct by the Distributor Defendants is responsible for the volume of prescription opioids entering into and plaguing Inez.

29.     McKESSON CORPORATION ("McKesson") at all relevant times, operated as a licensed  pharmacy wholesaler in Kentucky. McKesson is registered with the Kentucky Secretary of State as a Delaware corporation. McKesson has its principal place of business located in  San Francisco, California.

30.     CARDINAL HEALTH, INC. ("Cardinal") at all relevant times, operated as a licensed   pharmacy wholesaler in Kentucky. Cardinal is registered through various entities including  Cardinal Health 100, Inc. with the Kentucky Secretary of State as an Indiana

corporation, with its principal office located in Dublin, Ohio. Cardinal Health, Inc. is an Indiana corporation with its principal place of business in Dublin, Ohio.

31. AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") at all relevant times, operated as a licensed pharmacy wholesaler in Kentucky. AmerisourceBergen is registered with the Kentucky Secretary of State as a Delaware corporation which may be served through its registered agent for service of process. AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania.

32. The data which reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. *See Madel v. USDOJ*, 784 F.3d 448 (8th Cir. 2015). Neither the DEA[8] nor the wholesale distributors[9] will voluntarily disclose the data necessary to identify with specificity the transactions which will form the evidentiary basis for the many claims asserted herein.

33. Consequently, Plaintiff has named the three (3) wholesale distributors (i.e., AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation) which dominate 85% of the market share for the distribution of prescription opioids, whose principal business is the nationwide wholesale distribution of prescription drugs. *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal Health, Inc., McKesson Corporation, and AmerisourceBergen Drug Corporation predecessors). Each has been

---

[8] Declaration of Katherine L. Myrick, Chief, Freedom of Information (FOI)/Privacy Act Unit ("SARF"), FOI, Records Management Section ("SAR"), Drug Enforcement Administration (DEA), United States Department of Justice (DOJ), *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 23) (filed 02/06/14) (noting that ARCOS data is "kept confidential by the DEA").

[9] *See* Declaration of Tina Lantz, Cardinal Health VP of Sales Operation, *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 93) (filed 11/02/16) ("Cardinal Health does not customarily release any of the information identified by the DEA notice letter to the public, nor is the information publicly available. Cardinal Health relies on DEA to protect its confidential business information reported to the Agency.").

investigated and/or fined by the DEA for the failure to report  suspicious orders. Plaintiff has reason to believe each has engaged in unlawful conduct  which resulted in the diversion of prescription opioids  into Plaintiff's  community  and  that  discovery  will  likely  reveal  others  who  likewise engaged  in  unlawful  conduct.  Plaintiff  names each of these corporations herein as defendants and places the industry on notice that the Plaintiff is acting to abate the public nuisance plaguing the  community.  Plaintiff  will  request expedited discovery pursuant to Rule 26(d) of the Federal Rules of Civil Procedure  to  secure  the  data  necessary  to  reveal  and/or  confirm  the  identities of  the  wholesale  distributors, including data from the ARCOS database.

### III. JURISDICTION & VENUE

34.    This  Court  has  original  jurisdiction  over  this  action  for  purposes  of  pretrial proceedings pursuant to 28 U.S.C. § 1407, and Case Management Order One entered in *In Re: National Prescription Opiate Litigation* (1:17-CV-2804, N.D. Ohio, April 11, 2018).

35.    Jurisdiction and venue for remand or trial of this action is proper in the Eastern District of Kentucky ("EDKY").  EDKY has jurisdiction based upon complete  diversity  of Plaintiff and Defendants pursuant to 28 U.S.C. § 1332.  Defendants are  subject  to  EDKY's jurisdiction  pursuant to KRS 454.210, as Defendants, by and through  their  authorized  agents, servants  and  employees,  regularly  transacted business in Kentucky, manufactured, supplied, and distributed opioids in Kentucky,  and  through  their  illegal  acts  and  omissions,  tortuously  caused injuries  in  Kentucky.  Defendants derived substantial revenue as the result of the opioids that were distributed in Kentucky and later consumed by persons then residing in Kentucky. Damages sought in this case exceed $75,000.00

36.    Defendants are also subject to EDKY's jurisdiction because Defendants  conduct business in  Kentucky, purposefully direct or directed their actions toward Kentucky, consented to be sued  in  Kentucky by registering an agent for service of process, consensually submitted to

the  jurisdiction of Kentucky when obtaining a manufacturer or distributor license, and have the requisite minimum contacts with Kentucky necessary to permit EDKY to  exercise jurisdiction over Defendants.

37.    EDKY also has personal jurisdiction over all of the Defendants under 18 U.S.C. § 1965(b). EDKY may exercise nation-wide jurisdiction over the named Defendants  where the "ends of justice" require national service and Plaintiff demonstrates national  contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members   of the nationwide RICO enterprise before the Court in a single trial. *See, e.g., Iron Workers  Local Union No. 17 Insurance Fund v. Philip Morris Inc.*, 23 F. Supp. 2d 796 (1998) (citing  *LaSalle National Bank v. Arroyo Office Plaza, Ltd.*, 1988 WL 23824, *3 (N.D. Ill. Mar 10,  1988); *Butcher's Union Local No. 498 v. SDC Invest., Inc.*, 788 F.2d 535, 539 (9th Cir.  1986).

38.    Venue is proper in EDKY pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965, as a substantial part of the events or omissions giving rise to the claim occurred in this District and each Defendant transacted affairs and conducted activity that gave rise to the claim of relief in this District. 28 U.S.C. §§ 1391(b); § 1965(a).

39.    Plaintiff does not bring any product liability claims or causes of action and does not seek  compensatory damages for death, physical injury to person, or emotional distress. Plaintiff does not bring common law claims for property damage.

## IV.  ADDITIONAL ALLEGATIONS COMMON TO ALL COUNTS

40.    The past two decades have been characterized by increasing abuse and diversion  of  prescription drugs, including opioid medications, in the United States.[10]

---

[10] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J.  Med. 241 (2015).

41.     Prescription opioids have become widely prescribed. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[11]

42.     By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. The News Release noted:

a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

b.  More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

c.  Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

d.  Almost 5,500 people start to misuse prescription painkillers every day.[12]

43.     The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.[13]

44.     Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is unacceptable. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.[14]

---

[11] Katherine M. Keyes at al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

[12] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[13] *See* Califf et al., *supra* note 3

[14] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf.

45.     Moreover, the CDC has identified addiction to prescription pain medication as the strongest   risk factor for heroin addiction. People who are addicted to prescription opioid painkillers  are forty times more likely to be addicted to heroin.[15]

46.     Heroin is pharmacologically similar to prescription opioids. The majority of current heroin  users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk  factor for heroin use.[16]

47.     The CDC reports that drug overdose deaths involving heroin continued to climb sharply,  with heroin overdoses more than tripling in 4 years. This increase mirrors large increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence. Past misuse of prescription opioids is the strongest risk  factor for heroin initiation and use, specifically among persons who report past-year  dependence or abuse. The increased availability of heroin, combined with its relatively low price  (compared  with diverted prescription opioids) and high purity appear to be major  drivers of the upward trend in heroin use and overdose.[17]

48.     The societal costs of prescription drug abuse are "huge."[18]

_____

[15] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Today's Heroin Epidemic*,  https://www.cdc.gov/vitalsigns/heroin/index.html (last updated July 7, 2015).

[16] *See* Wilson M. Compton, *Relationship Between Nonmedical Prescription-Opioid Use and Heroin*, 374 N. Eng. J. Med. 154 (2016).

[17] *See* Rose A. Rudd et al., *Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014*, 64  Morbidity & Mortality Wkly. Rep. 1378 (2016).

[18] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal  Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL  1637016, at *10 [hereinafter Brief of HDMA].

49.     Across the nation, local governments are struggling with a pernicious, ever-expanding epidemic of opioid addiction and abuse. Every day, more than 90 Americans lose their lives after overdosing on opioids.[19]

50.     The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[20] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[21]

51.     The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999–2014. Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[22]

52.     The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[23]

53.     Every day brings a new revelation regarding the depth of the opioid plague: just to name one example, the New York Times reported in September 2017 that the epidemic, which

---

[19] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis, last visited April 9, 2018) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F, Scholl L. Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015. MMWR Morb Mortal Wkly Rep 2016;65:1445–1452. DOI: http://dx.doi.org/10.15585/mmwr.mm655051e1)

[20] Opioid Crisis, NIH.

[21] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).

[22] *See* Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65 Morbidity & Mortality Wkly. Rep. 1445 (2016).

[23] *See* Volkow & McLellan, *supra* note 1.

now claims 60,000 lives a year, is now killing babies and toddlers because ubiquitous, deadly opioids are "everywhere" and mistaken as candy.[24]

54.     The epidemic of prescription pain medication and heroin deaths is devastating families and  communities across the country.[25] Meanwhile, the manufacturers and distributors of prescription opioids extract billions of dollars of revenue from the addicted American public while public entities experience tens of millions of dollars of injury caused by the  reasonably foreseeable consequences of the prescription opioid addiction epidemic.

55.     Defendants, have  continued their wrongful, intentional, and unlawful conduct, despite their knowledge that   such conduct is causing and/or continuing to the national, state, and local opioid epidemic.

56.     The Commonwealth of Kentucky, it's counties, and cities have been impacted severely by the national opioid crisis.

57.     Kentucky has an opioid prescription rate of 128.4 per 100 persons, which ranks fourth in  the country (U.S. median rate: 82.5).[26]

58.     Inez is located in eastern Kentucky.  Plaintiff and its community have suffered as a result of the opioid crisis.

---

[24] Julie Turkewitz, 'The Pills are Everywhere': How the Opioid Crisis Claims Its Youngest Victims, N.Y. Times,  Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

[25] See Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres.  Doc. 743 (Oct. 21, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf.

[26] See Leonard J. Paulozzi, M.D., et al., Vital Signs: Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines – United States, 2012, Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services (July 4, 2014). The combination of hydrocodone, oxycodone, and benzodiazepines is referred to as the "holy trinity" and significantly increases the risk of harm to those that abuse prescription pills.

59.     Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Because of the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

60.     Each Manufacturer Defendant has conducted, and has continued to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.

61.     The Manufacturer Defendants have made false and misleading claims, contrary to the language on their drugs' labels, regarding the risks of using their drugs that: (1) downplayed the serious risk of addiction; (2) created and promoted the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable

evidence to support the Manufacturer Defendants' claims.

62.     The Manufacturer Defendants have disseminated these common messages to reverse the  popular and medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, and through unbranded marketing and industry-funded front groups.

63.     Defendants' efforts have been successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009.[27]   In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General  expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors... [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when  prescribed for legitimate pain."[28] This epidemic has resulted in a flood of prescription  opioids available for illicit use or sale (the supply), and a population of patients physically  and psychologically dependent on them (the demand). And when those patients can no  longer afford or obtain opioids from licensed dispensaries, they often turn to the street to  buy prescription opioids or even non-prescription opioids, like heroin.

64.     The Manufacturer Defendants intentionally continued their conduct, as alleged herein, with  knowledge that such conduct was creating the opioid nuisance and causing the harms and  damages alleged herein.

---

[27] *See* Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine*, Fortune, Nov. 9, 2011, http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/; David Crow, *Drugmakers Hooked on $10bn Opioid Habit*, Fin. Times, Aug. 10, 2016, https://www. ft.com/content/f6e989a8-5dac-11e6-bb77-a121aa8abd95.

[28] Letter from Vivek H. Murthy, U.S. Surgeon General (Aug. 2016), http://turnthetiderx.org/.

65.     The Manufacturer Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in and around the State, including in Plaintiff's Community. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the State and Plaintiff's Community.

66.     The Manufacturer Defendants employed the same marketing plans and strategies and deployed the same messages in and around the State, including in Plaintiff's Community, as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that the Manufacturer Defendants' messages are accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising – and in each sales territory. The Manufacturer Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

67.     The Manufacturer Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. The Manufacturer Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

68.     The Manufacturer Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Manufacturer Defendant conducted and continues to conduct advertising

campaigns touting the purported benefits of their branded drugs. For example, upon information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

69.    Many of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker, chef, and teacher, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. Upon information and belief, Purdue also ran a series of ads, called "Pain Vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

70.    The Manufacturer Defendants promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. They devoted massive resources to direct sales contacts with doctors. Upon information and belief, in 2014 alone, the Manufacturer Defendants spent in excess of $168 million on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

71.    The Manufacturer Defendants' detailing to doctors is effective. Studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. The Manufacturer Defendants purchase, manipulate and analyze some of the most sophisticated data available in any industry, data available from IMS Health Holdings, Inc., to track the rates of initial prescribing and renewal by individual doctors, which in turn allows them to target, tailor, and monitor the impact of their core messages.

72.     The Manufacturer Defendants' detailers have been reprimanded for their deceptive promotions. In March 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated." Those materials in particular "fail to reveal warnings regarding potentially fatal abuse of opioids, use by individuals  other than the patient for whom the drug was prescribed."[29]

73.     The  Manufacturer Defendants' indirectly marketed their opioids using unbranded advertising, paid speakers and "key opinion leaders" ("KOLs"), and industry-funded  organizations posing as neutral and credible  professional  societies  and patient advocacy  groups (referred to hereinafter as "Front Groups").

74.     The  Manufacturer   Defendants   deceptively   marketed   opioids   in   the Commonwealth of Kentucky through  unbranded  advertising – e.g., advertising that  promotes opioid use  generally but does not name a specific opioid. This advertising was ostensibly created and  disseminated by independent third parties. But by funding, directing, reviewing, editing,  and distributing  this  unbranded  advertising,  the  Manufacturer  Defendants  controlled  the  deceptive messages  disseminated by these third parties and acted in concert with them to   falsely  and misleadingly promote opioids  for the treatment of  chronic  pain.

75.     The  Manufacturer  Defendants  marketed  through  third-party,  unbranded advertising  to  avoid regulatory scrutiny because that advertising is not submitted to and typically is  not reviewed  by  the FDA. The Manufacturer Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an  independent

---

[29] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to  Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18,2010), http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

and objective source. The Manufacturer Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long term opioid use for chronic pain.

76. Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Defendants. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

77. The Manufacturer Defendants worked through third parties they controlled by: (a) funding, assisting, encouraging, and directing doctors who served as KOLs, and (b) funding, assisting, directing, and encouraging seemingly neutral and credible Front Groups. The Manufacturer Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, CME programs, medical conferences and seminars, and scientific articles. Thus, working individually and collectively, and through these Front Groups and KOLs, the Manufacturer Defendants persuaded doctors and patients that what they have long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and that the compassionate treatment of pain required opioids.

78. In 2007, multiple States sued Purdue for engaging in unfair and deceptive practices in its marketing, promotion, and sale of OxyContin. Certain states settled their claims in a series of Consent Judgments that prohibited Purdue from making misrepresentations in the promotion and marketing of OxyContin in the future. By using indirect marketing strategies, however,

Purdue intentionally circumvented these restrictions. Such actions include contributing the creation of misleading publications and prescribing guidelines which lack reliable scientific basis and promote prescribing practices which have worsened the opioid crisis.

79.     Doctors who are "pro-opioid" are one of the avenues that the Manufacturer Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. The Manufacturer Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the State of New York found in its settlement with Purdue that the Purdue website "In the Face of Pain" failed to disclose that doctors who provided testimonials on the site were paid by Purdue and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

80.     The Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of the Manufacturer Defendants, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted the Manufacturer Defendants by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

81.     These Front Groups depended on the Manufacturer Defendants for funding and, in some cases, for survival. The Manufacturer Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, the Manufacturer Defendants made sure that the Front

Groups would generate only the messages that the Manufacturer Defendants wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

82.     Defendants Cephalon, Endo, Janssen, and Purdue, in particular, utilized many Front Groups, including many of the same ones. Several of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), the Center for Practical Bioethics ("CPB"), the U.S. Pain Foundation ("USPF") and Pain & Policy Studies Group ("PPSG").[30]

83.     The most prominent of the Manufacturer Defendants' Front Groups was the American Pain Foundation ("APF"), which, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012, primarily from Endo and Purdue. APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach citizens of the State and Plaintiff's Community.

---

[30] *See generally, e.g.*, Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015), https://www.finance.senate.gov/imo/media/doc/050517%20Senator%20Wyden%20to%20Secretary%20Price%20re%20FDA%20Opioid%20Prescriber%20Working%20Group.pdf

84.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3  million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, upon information and belief, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.

85.    APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. Upon information and belief, it was often called upon to provide "patient representatives" for the Manufacturer Defendants' promotional activities, including for Purdue's Partners Against Pain and Janssen's Let's Talk Pain. APF functioned largely as an advocate for the interests of the Manufacturer Defendants, not patients. Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

86.    Upon information and belief, on several occasions, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these  activities and publications, knowing that drug companies would support projects conceived   as a result of these communications.

87.    The U.S. Senate Finance Committee began looking into APF in May 2012 to determine the  links, financial and otherwise, between the organization and the manufacturers  of opioid painkillers. The investigation caused considerable damage to  APF's credibility as an

objective and neutral third party, and the Manufacturer Defendants stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[31]

88.     Another front group for the Manufacturer Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement, and funding of the Manufacturer Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

89.     AAPM received substantial funding from opioid manufacturers. For example, AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

90.     Upon information and belief, AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM

---

[31] Charles Ornstein & Tracy Weber, *Senate Panel Investigates Drug Companies' Ties to Pain Groups*, Wash. Post, May 8, 2012,
https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html.

conferences, funded its CMEs, and distributed its publications. The conferences  sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference  alone. AAPM's presidents have included top industry-supported KOLs Perry  Fine and Lynn Webster. Dr. Webster was even elected president of AAPM while under a  DEA investigation.

91.    The Manufacturer Defendants were able to influence AAPM through significant and regular funding and via the leadership of pro-opioid KOLs within the  organization.

92.    In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and  claimed that the risk of a patients' addiction to opioids was low. Dr. Haddox, who co-  authored the AAPM/APS statement, was a paid speaker for Purdue at the time. Dr.  Portenoy was the sole consultant. The consensus statement remained on AAPM's website  until 2011, and, upon information and belief, was taken down from AAPM's website only  after a doctor complained.[32]

93.    AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[33] Treatment  guidelines have been relied upon by doctors, especially the general practitioners and family  doctors targeted by the Manufacturer Defendants. Treatment guidelines not only directly  inform doctors' prescribing practices, but are cited throughout the scientific literature and  referenced by third-party payors in determining whether they should cover treatments for  specific indications. Pharmaceutical sales representatives employed by Endo, Actavis, and  Purdue discussed treatment guidelines with doctors during individual sales visits.

---

[32] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of  Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).

[33] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J.  Pain 113 (2009).

94.     At least fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[34] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Manufacturer Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in the State and/or Plaintiff's Community during the relevant time period, are available online, and were reprinted in the Journal of Pain. The Manufacturer Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Manufacturer Defendants financial support to members of the panel.

95.     The Manufacturer Defendants worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Manufacturer Defendants. Among other projects, PCF worked to

---

[34] *Id.*

ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Manufacturer Defendants determined would reduce prescribing.

96. To falsely assure physicians and patients that opioids are safe, the Manufacturer Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low risk because most patients would not become addicted, and because those at greatest risk for addiction could be identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. The Manufacturer Defendants have not only failed to correct these misrepresentations, they continue to make them today.

97. Opioid manufacturers, including Defendants Endo Pharmaceuticals, Inc. and Purdue Pharma L.P., have entered into settlement agreements with public entities that prohibit them from making many of the misrepresentations identified in this Complaint. Yet even afterward, each Manufacturer Defendant continued to misrepresent the risks and benefits of long-term opioid use in the State and Plaintiff's Community and each continues to fail to correct its past misrepresentations.

98. Some illustrative examples of the Manufacturer Defendants' false, deceptive, and unfair claims about the purportedly low risk of addiction include:

a. Actavis's predecessor caused a patient education brochure, Managing

Chronic Back Pain, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009 and beyond;

b.  Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which suggested that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available online;[35]

c.  Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Upon information and belief, another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications;

d.  upon information and belief, Endo distributed a pamphlet with the Endo logo entitled Living with Someone with Chronic Pain, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem;"

e.  Janssen reviewed, edited, approved, and distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain;"

f.  Janssen currently runs a website, Prescriberesponsibly.com (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated;"

g.  Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "[m]isconceptions about opioid addiction;"[36]

---

[35] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) [hereinafter APF, *Treatment Options*], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

[36] Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF, *Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-

    h.   consistent with the Manufacturer Defendants' published marketing materials, upon information and belief, detailers for Purdue, Endo, Janssen, and Cephalon in the State and Plaintiff's Community minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above; and

    i.   seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NFP argued in an amicus brief to the United States Fourth Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by their KOL, Dr. Portenoy;[37]

99.    These claims are contrary to longstanding scientific evidence. A 2016 opioid-prescription guideline issued by the CDC (the "2016 CDC Guideline") explains that there is "[e]xtensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction], [and] overdose . . .)."[38] The 2016 CDC Guideline further explains that "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[39]

100.    The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for extended-release and long-acting ("ER/LA") opioids in 2013 and for immediate release ("IR") opioids in 2016. In its

---

guide.pdf.

[37] Brief of the American Pain Foundation, the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz*, No. 05-4474 (4th Cir. Sept. 8, 2005) [hereinafter Brief of APF] at 9.

[38] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, Morbidity & Mortality Wkly. Rep., Mar. 18, 2016, at 15 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[39] *Id.* at 2, 25.

announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed.[40]

101.    The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder.[41] Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Endo remains free, however,

---

[40] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., v. U.S. Dep't of Health and Human Servs., to Andrew Koldny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), https://www.regulations.gov/contentStreamer?documentId=FDA-2012-P-0818-0793&attachmentNumber=1&contentType=pdf.; Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan and Becker, LLP (Mar. 22, 2016), https://www.regulations.gov/contentStreamer?documentId=FDA-2014-P-0205-0006&attachmentNumber=1&contentType=pdf.

[41] Assurance of Discontinuance, *In re Endo Health Solutions Inc. and Endo Pharm. Inc. (*Assurance No. 15-228), at 16, https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

to make those statements in this State.

102.    In addition to mischaracterizing the highly addictive nature of the drugs they were pushing, the Manufacturer Defendants also fostered a fundamental misunderstanding of the signs of addiction. Specifically, the Manufacturer Defendants misrepresented, to doctors and patients, that warning signs and/or symptoms of addiction were, instead, signs of undertreated pain (i.e. pseudoaddiction) – and instructed doctors to increase the opioid prescription dose for patients who were already in danger.

103.    To this end, one of Purdue's employees, Dr. David Haddox, invented a phenomenon called "pseudoaddiction." KOL Dr. Portenoy popularized the term. Examples of the false, misleading, deceptive, and unfair statements regarding pseudoaddiction include:

a.  Cephalon and Purdue sponsored Responsible Opioid Prescribing (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction.[42] The 2012 edition, which remains available for sale online, continues to teach that pseudoaddiction is real;[43]

b.  Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management;"

c.  Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials;

d.  Purdue published a pamphlet in 2011 entitled Providing Relief, Preventing Abuse, which, upon information and belief, described pseudoaddiction as a

---

[42] Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2007) at 62.

[43] *See* Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2d ed. 2012)

concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated;" and

 e. upon information and belief, Purdue sponsored a CME program titled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse". In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

 104. In the 2016 CDC Guideline, the CDC rejects the validity of the pseudoaddiction fallacy invented by a Purdue employee as a reason to push more opioid drugs onto already addicted patients.[44]

 105. In addition to misstating the addiction risk and inventing the pseudoaddiction falsehood, a third category of false, deceptive, and unfair practice is the Manufacturer Defendants' false instructions that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Manufacturer Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Manufacturer Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

 a. Endo paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy

---

[44] *Id.* at 2, 25.

using a "maximally structured approach" involving toxicology screens and pill counts;

b. Purdue, upon information and belief, sponsored a 2011 webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths;"

c. As recently as 2015, upon information and belief, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

106. The 2016 CDC Guideline confirms the falsity of these claims. The Guideline explains that there are no studies assessing the effectiveness of risk mitigation strategies "for improving outcomes related to overdose, addiction, abuse or misuse."[45]

107. A fourth category of deceptive messaging regarding dangerous opioids is the Manufacturer Defendants' false assurances regarding the alleged ease of eliminating opioid dependence. The Manufacturer Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, but they failed to disclose the increased difficulty of stopping opioids after long-term use. In truth, the 2016 CDC Guideline explains that the symptoms of opioid withdrawal include abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia, drug cravings, anxiety, insomnia, spontaneous abortion and premature labor in pregnant women.[46]

108. The Manufacturer Defendants downplayed the severity of opioid detoxification. Upon information and belief, a CME sponsored by Endo, entitled Persistent Pain in the Older Adult, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose

---

[45] *Id.* at 11.

[46] *Id.* at 26.

by 10% - 20% for 10 days. And Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.[47]

109.     A fifth category of false, deceptive, and unfair statements the Manufacturer Defendants made to sell more drugs is that opioid dosages could be increased indefinitely without added risk. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. The Manufacturer Defendants' deceptive claims include:

a.  upon information and belief, Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis appears to have continued to use these materials in 2009 and beyond;

b.  Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and insinuated that they are therefore the most appropriate treatment for severe pain.[48] This publication is still available online;

c.  Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain;"

d.  Endo distributed a pamphlet edited by a KOL entitled Understanding Your Pain: Taking Oral Opioid Analgesics (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I

---

[47] APF, *Policymaker's Guide*, *supra*, at 32.

[48] APF, *Treatment Options*, *supra*, at 12.

really need it?" The response is, "The dose can be increased. . . . You won't 'run out' of pain relief;"[49]

e. Janssen sponsored a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages;

f. upon information and belief, Purdue's in the Face of Pain website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g. Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which taught that dosage escalations are "sometimes necessary," and that "the need for higher doses of medication is not necessarily indicative of addiction," but inaccurately downplayed the risks from high opioid dosages;[50]

h. in 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit and available until at least 2012. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages;

i. Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose; and[51]

j. seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NFP argued in an amicus brief to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[52]

110. Once again, the 2016 CDC Guideline reveals that the Manufacturer Defendants'

---

[49] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

[50] APF, *Policymaker's Guide*, *supra*, at 32.

[51] The College on Problems of Drug Dependence, *About the College*, http://cpdd.org (last visited April 9, 2018).

[52] Brief of APF, *supra*, at 9.

representations regarding opioids were lacking in scientific evidence. The 2016 CDC Guideline clarifies that the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."[53] More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[54] The CDC also states that there is an increased risk "for opioid use disorder, respiratory depression, and death at higher dosages."[55] That is why the CDC advises doctors to "avoid increasing dosage" to above 90 morphine milligram equivalents per day.[56]

111.    Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can cure addiction and abuse.

112.    The Manufacturer Defendants made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. This claim was false. The FDA warned in a 2013 letter that Opana ER Extended-Release Tablets' "extended- release features can be compromised, causing the medication to 'dose dump,' when subject to . . . forms of manipulation such as cutting, grinding, or chewing, followed by swallowing."[57] Also troubling, Opana ER can be prepared

---

[53] 2016 CDC Guideline, *supra* note 50, at 22–23.

[54] *Id.* at 23-24.

[55] *Id.* at 21.

[56] *Id.* at 16.

[57] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Barto, Vice President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 5.

for snorting using commonly available methods and "readily prepared for injection."[58] The letter discussed "the  troubling possibility that a higher (and rising) percentage of [Opana ER Extended-Release  Tablet] abuse is occurring via injection."[59] Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed. In June 2017, the FDA requested  that Opana ER be removed from the market.

113.     To convince doctors and patients that opioids should be used to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was a significant upside  to long-term  opioid use. But as the CDC Guideline makes clear, "[n]o evidence shows a  long-term benefit of opioids in pain and function versus no opioids for chronic pain with  outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less  harmful than long-term opioid use.[60] The FDA, too, has recognized the lack of evidence  to support long-term opioid use. Despite this, Defendants falsely and misleadingly touted  the benefits of long-term opioid use and falsely and misleadingly suggested that these  benefits were supported by scientific evidence.

114.     Some illustrative examples of the Manufacturer Defendants' false claims are:

   a.  upon information and belief, Actavis distributed an advertisement claiming that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on  your body and your mental health," and help patients enjoy their lives;

   b.  Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and  portrayed seemingly healthy, unimpaired subjects;

   c.  Janssen sponsored and edited a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009) – which states as "a fact" that

---

[58] *Id.* at 6.

[59] *Id.*  at 6, n. 21.

[60] *Id*. at 15.

"opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs;

d. Janssen promoted Ultracet for everyday chronic pain and distributed posters, for display in doctors' offices, of presumed patients in active professions; the caption read, "Pain doesn't fit into their schedules;

e. upon information and belief, Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves patients' function;

f. responsible Opioid Prescribing (2007), sponsored and distributed by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function;

g. responsible Opioid Prescribing (2007), sponsored and distributed by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function;

h. Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve."[61] This publication is still available online;

i. Endo's NIPC website "PainKnowledge" claimed in 2009, upon information and belief, that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site;

j. Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient."[62] Upon information and belief, a CME disseminated via webcast claimed that chronic opioid therapy has been

---

[61] APF, *Treatment Options, supra.*

[62] *E.g.*, NIPC, *Persistent Pain and the Older Patient* (2007), https://www.painedu.org/Downloads/NIPC/Activities/B173_Providence_RI_%20Invite.pdf.

"shown to reduce pain and improve depressive symptoms And cognitive functioning;"

k. Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain." One feature of the campaign was to complain that patients were under-treated. In 2009, upon information and belief, a Janssen-sponsored website, part of the "Let's Talk Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function;"

l. Purdue sponsored the development and distribution of APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[m]ultiple clinical studies" have shown that opioids are effective in improving "[d]aily function," "[p]sychological health," and "[o]verall health-related quality of life for chronic pain."[63] The Policymaker's Guide was originally published in 2011; and

m. Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

115.    As the FDA and other agencies have made clear for years, these claims have no support in the scientific literature.

116.    In 2010, the FDA warned Actavis, in response to its advertising of Kadian described above, that "we are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[64] And in 2008, upon information and belief, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

---

[63] APF, *Policymaker's Guide*, *supra*, at 29.

[64] Letter from Thomas Abrams to Doug Boothe, *supra* note 32.

117.    The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by the Manufacturer Defendants contravene pronouncements by and  guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA  changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options"  like non-opioid drugs "are inadequate." And the 2016 CDC Guideline states that NSAIDs,  not opioids, should be the first-line treatment for chronic pain, particularly arthritis and  lower back pain.[65] Purdue misleadingly promoted OxyContin as being  unique  among  opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action.  Upon information and belief, Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is  because OxyContin  tablets  release  approximately  40%  of  their  active  medicine  immediately, after which  release  tapers. This  triggers a powerful  initial  response, but  provides little or no pain relief  at  the  end  of  the  dosing  period,  when  less  medicine  is  released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008  that a "substantial proportion" of chronic pain patients taking OxyContin experience it.  This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also  makes OxyContin more dangerous because the declining pain relief patients experience  toward the end of each dosing period drives them to take more OxyContin before the next  dosing period begins, quickly increasing the amount of drug they are taking and spurring  growing dependence.

---

[65] 2016 CDC Guideline, *supra*, at 12.

118.    Purdue's competitors were aware of this problem. For example, upon information and belief, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours.   Upon information and belief, Purdue's sales representatives continue to tell doctors that  OxyContin lasts a full 12 hours.

119.    Front Groups supported by Purdue likewise echoed these representations. For example, in an amicus brief submitted to the Supreme Court of Ohio by the American Pain Foundation, the National Foundation for the Treatment of Pain and the Ohio Pain Initiative  in support of Purdue, those amici represented:

> OxyContin is particularly useful for sustained long-term pain because it  comes in higher, compact pills with a slow release coating. OxyContin pills can work for 12 hours. This makes it easier for patients to comply with  dosing requirements without experiencing a roller-coaster of pain relief  followed quickly by  pain renewal that can occur with shorter acting  medications. It also helps the patient sleep through the night, which is often  impossible with short-acting medications. For many of those serviced by  Pain Care Amici, OxyContin has been a miracle medication.[66]

120.    Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid  tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR  opioids. Neither is approved for or has been shown to be safe or effective for chronic pain.  Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but  cancer pain, and refused to approve Fentora for the treatment of chronic pain because of  the potential harm, including the high risk of "serious and life-threatening adverse events"  and abuse – which are greatest in non-

---

[66] Reply Brief of Amicus Curiae of the American Pain Foundation, The National Foundation for the Treatment  of Pain and the Ohio Pain Initiative Supporting Appellants, *Howland v. Purdue Pharma L.P.*, No. 2003-1538  (Ohio Apr. 13, 2004), 2004 WL 1637768, at *4 (footnote omitted).

cancer patients. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post- operative pain, or pain due to injury.[67] Specifically, the FDA advised that Fentora "is only approved for breakthrough cancer pain in patients who are opioid-tolerant, meaning those patients who take a regular, daily, around-the-clock narcotic pain medication."[68]

121.    Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, and for which it is not safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example:

a.  Cephalon paid to have a CME it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain;

b.  upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain; and

c.  in December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to

---

[67] See U.S. Food & Drug Admin., *Public Health Advisory: Important Information for the Safe Use of Fentora (fentanyl buccal tablets)* (Sept. 26, 2007), https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm051273.htm.

[68] *Id.*

thousands of anesthesiologists and other medical professionals.  The  Special Report  openly  promotes  Fentora  for  "multiple  causes  of  pain" – and not just cancer pain.

122.     Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also  approved by the FDA for such uses.

123.     Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives  have maintained a database since 2002 of doctors suspected of inappropriately prescribing  its  drugs. Rather  than  report  these  doctors  to  state  medical  boards  or  law  enforcement  authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used  the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that  Purdue had promoted as less addictive – in order to persuade the FDA to bar the  manufacture and sale of generic copies of the drug because the drug was too likely to be  abused. In an interview with the Los Angeles Times, Purdue's senior compliance officer  acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs.  The  same  was  true  of  prescribers;  despite  its  knowledge  of  illegal prescribing, Purdue did not report that a Los Angeles clinic prescribed more than 1.1 million OxyContin tablets  and that Purdue's district manager described it internally as "an organized drug ring" until  years after law enforcement shut it down. In doing so, Purdue protected its own profits at  the expense of public health and safety.[69]

124.     Like Purdue, Endo has been cited for its failure to set up an effective system for

---

[69] Harriet Ryan et al., *More Than 1 Million Oxycontin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, L.A. Times, July 10, 2016, http://www.latimes.com/projects/la-me-oxycontin-part2/.

identifying and reporting suspicious prescribing. In its settlement agreement with Endo,  the State of New York found that Endo failed to require sales representatives to report signs  of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for  detailing prescribers who were subsequently arrested or convicted for illegal prescribing;  and failed to prevent sales representatives from visiting prescribers whose suspicious  conduct had caused them to be placed on a no-call list.

125.    As a part of their deceptive marketing scheme, the Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the  U.S., including this State and Plaintiff's Community. For example, the Manufacturer  Defendants focused their deceptive marketing on primary care doctors, who were more  likely to treat chronic pain patients and prescribe them drugs, but were less likely to be  educated about treating pain and the risks and benefits of opioids and therefore more likely  to accept the Manufacturer Defendants' misrepresentations.

126.    The Manufacturer Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. The Manufacturer Defendants  targeted these vulnerable patients even though the risks of long-term opioid use were  significantly greater for them. For example, the 2016 CDC Guideline observes that existing   evidence confirms that elderly patients taking opioids suffer from elevated fall and fracture   risks, reduced renal function and medication clearance, and a smaller window between safe  and unsafe dosages.[70] The 2016 CDC Guideline concludes that there must be "additional  caution and increased monitoring" to minimize the risks of opioid use in elderly patients.  *Id.* at 27. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post- traumatic stress

---

[70] 2016 CDC Guideline, *supra*, at 13.

disorder, which interact dangerously with opioids.

127. As alleged herein, the Manufacturer Defendants made and/or disseminated deceptive statements regarding material facts and further concealed material facts, in the course of manufacturing, marketing, and selling prescription opioids. The Manufacturer Defendants' actions were intentional and/or unlawful. Such statements include, but are not limited to, those set out below and alleged throughout this Complaint.

128. Defendants Purdue, Endo, Jansen, Cephalon and Actavis, made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;

b. creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c. disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through their own unbranded publications and on internet sites they operated that were marketed to and accessible by consumers;

d. distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

e. sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

f. endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g. providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h. providing needed financial support to pro-opioid pain organizations that made

deceptive statements, including in  patient education materials, concerning the use  of opioids to  treat chronic non-cancer pain;

i.  assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid  addiction;

j.  endorsing and assisting in the distribution of CMEs containing  deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the  long-term treatment of chronic non-cancer pain and that opioids  improve quality of life, while concealing contrary data;

l.  assisting in the dissemination of literature written by pro-opioid  KOLs that contained deceptive statements concerning the use of  opioids to treat chronic noncancer pain;

m.  creating, endorsing, and supporting the distribution of patient  and prescriber education materials that misrepresented the data  regarding the safety and efficacy of opioids for the long-term  treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

n.  targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive  statements concerning the use of opioids to treat chronic non-  cancer pain;

o.  targeting the elderly by assisting in the distribution of guidelines  that  contained deceptive statements concerning the  use  of opioids to treat chronic non-cancer pain and misrepresented the  risks of opioid addiction in this population;

p.  exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

q.  making deceptive statements concerning the use of opioids to  treat chronic noncancer pain to prescribers through in-person  detailing; and

r.  withholding from law enforcement the names of prescribers Purdue believed to be facilitating the diversion of its opioid, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and  advertisements and CMEs they knew would reach these same prescribers.

129.  The Manufacturer Defendants, both individually and collectively, made, promoted,

and profited from their misrepresentations about the risks and benefits of opioids for  chronic pain even though they knew that their misrepresentations were false and deceptive.   The history of opioids, as well as research and clinical experience establish that opioids are  highly addictive and are responsible for a long list of very serious adverse outcomes. The  FDA warned Defendants of this, and Defendants had access to scientific studies, detailed  prescription data, and reports of adverse events, including reports of addiction,  hospitalization, and death – all of which clearly described the harm from long-term opioid  use and that patients were suffering from addiction, overdose, and death in alarming  numbers. More recently, the FDA and CDC have issued pronouncements, based on medical   evidence, that conclusively expose the falsity of Defendants' misrepresentations, and Endo  and Purdue have recently entered agreements in New York prohibiting them from making  some of the same misrepresentations described in this Complaint.

130.    At all times relevant to this Complaint, the Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful,  unfair, and fraudulent conduct. For example, the Manufacturer Defendants disguised their   role in the deceptive marketing of chronic opioid therapy by funding and working through  third parties like Front Groups and KOLs. The Manufacturer Defendants purposefully hid   behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Manufacturer Defendants' false and deceptive  statements about the risks and benefits of long-term opioid use for chronic pain. Defendants   also never disclosed their role in shaping, editing, and approving the content of information   and  materials disseminated by these third parties. The Manufacturer Defendants exerted  considerable influence on these promotional and "educational" materials in emails,  correspondence, and meetings with KOLs, Front Groups, and public relations companies   that were not, and have not yet become, public. For example, PainKnowledge.org, which   is run by the NIPC, did not disclose Endo's involvement. Other

Manufacturer Defendants,  such as Purdue and Janssen, ran similar websites that masked their own role.

131.    The Manufacturer Defendants manipulated their promotional materials and   the scientific literature to make it appear that these documents were accurate, truthful, and  supported by objective evidence when they were  not. The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for  propositions the studies did not support. The Manufacturer Defendants invented  "pseudoaddiction" and promoted it to an unsuspecting medical community. The  Manufacturer Defendants provided the medical community with false and misleading  information about ineffectual strategies to avoid or control opioid addiction. The  Manufacturer Defendants recommended to the medical community that dosages be  increased, without disclosing the risks. The Manufacturer Defendants spent millions of  dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The lack of support for the Manufacturer Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by the Plaintiff or Plaintiff's Community. Thus, the Manufacturer Defendants  successfully concealed from the medical community, patients, and health care payors facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. Plaintiff did not know of the   existence or scope of the Manufacturer Defendants' industry-wide fraud and could not have  acquired such knowledge earlier through the exercise of reasonable diligence.

132.    The Distributor Defendants owe a duty under federal law (21 U.S.C. § 823, 21  CFR 1301.74) to monitor, detect, investigate,  refuse to fill, and report suspicious orders of prescription opioids originating from the Commonwealth of Kentucky and Inez, as well as those orders which the Distributor Defendants knew or  should have known were likely to be diverted into the

Commonwealth of Kentucky and Inez.

133.     The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

134.     Each Distributor Defendant repeatedly and purposefully breached its duties under state and federal law. Such breaches are a direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into the Commonwealth of Kentucky and Inez.

135.     The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the Commonwealth of Kentucky and Inez. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover here.

136.     The opioid epidemic in Kentucky, including *inter alia* in Inez, remains an immediate hazard to public health and safety.

137.     The opioid epidemic Inez is a public nuisance and remains unabated.

138.     The Distributor Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

139.     Opioids are a controlled substance. These "Schedule II" drugs are controlled substances with a "high potential for abuse." 21 U.S.C. §§ 812(b), 812(2)(A)-(C).

140.     As wholesale drug distributors, each Distributor Defendant was required under Kentucky law to obtain a license as a wholesaler of controlled substances.

141.     Each Distributor Defendant is licensed as a "registrant" or "licensee" as a wholesale distributor in the chain of distribution of Schedule II controlled substances and assumed a duty to comply with all security requirements imposed under the regulations adopted by the Commonwealth of Kentucky.

142.     Each Distributor Defendant was further required to register with the DEA, pursuant to the federal Controlled Substance Act. See 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.  Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of  distribution of Schedule II controlled substances with a duty to comply with all security  requirements imposed under that statutory scheme.

143.     Each Distributor Defendant has an affirmative duty under federal law  to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous  opioid drugs. Federal law requires that Distributors of Schedule II drugs, including opioids,  must maintain "effective control against diversion of particular controlled substances into  other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(b)(1).

144.     Federal regulations, similarly impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders  of controlled substances. The registrant [distributor] shall inform the Field Division Office   of the Administration in his area of suspicious orders when discovered by the registrant.  Suspicious orders include orders of unusual size, orders deviating substantially from a  normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

145.     "Suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern. See 21 CFR 1301.74(b).  These criteria are disjunctive and are not all inclusive. For example, if   an order deviates substantially from a normal pattern, the size of the order does not matter  and the order should be reported as suspicious. Likewise, a wholesale distributor need not  wait for a normal pattern to develop over time before determining whether a particular  order is suspicious. The size of an order alone, regardless of whether it deviates from a   normal pattern, is enough to trigger the wholesale distributor's responsibility to report the  order as suspicious. The determination of whether an order is suspicious

depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

146. In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. See *Southwood Pharm., Inc.*, 72 Fed. Reg. 36, 487, 36, 501 (Drug Enf't Admin. July 3, 2007); *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, No. 15-11355 (D.C. Cir. June 30, 2017). Regardless, all flagged orders must be reported. *Id.*

147. These prescription drugs are regulated to provide a "closed" system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. See, 1970 U.S.C.C.A.N. 4566, 4571-72.

148. Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities.[71]

---

[71] Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 [hereinafter Brief for HDMA and NACDS]. The Healthcare Distribution Management Association (HDMA or HMA)-now known as the Healthcare Distribution Alliance (HDA)-is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others: AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation. *See generally* HDA, *About*, https://www.healthcaredistribution.org/about (last visited Aug. 21, 2017). The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others: Walgreen Company, CVS Health, Rite Aid Corporation and Walmart. *See generally* NACDS, *Mission*, https://www.nacds.org/ about/mission/ (last visited Aug. 21, 2017).

149.     As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain.  If the closed system is to function properly … distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as … the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[72]

150.     The Distributor Defendants have admitted that they are responsible for reporting suspicious orders.[73]

151.     The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, in addition to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[74] The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes."[75] The DEA warns

---

[72] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) [hereinafter Rannazzisi Letter] ("This letter is being sent  to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute  controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance  distributors in view of the prescription drug abuse problem our nation currently faces."), *filed in Cardinal Health,  Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

[73] *See* Brief for HDMA and NACDS, *supra* note 85, 2016 WL 1321983, at *4 ("[R]egulations . . . in place for more  than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information  readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders).").

[74] Rannazzisi Letter, *supra*, at 2.

[75] *Id.* at 1.

that "even just one distributor that uses its DEA registration  to facilitate diversion can cause enormous harm."[76]

152.    The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[77] This letter reminds the Defendants of their statutory and regulatory duties to "maintain effective  controls against diversion" and "design and operate  a  system to  disclose to the registrant suspicious orders of controlled substances."[78] The letter further  explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders when discovered by the registrant. Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity purchases") does not meet the regulatory  requirement to report suspicious orders. Registrants are reminded that their  responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether  the  controlled  substances  are  likely  to  be  diverted  from legitimate channels.  Reporting  an order as suspicious will not absolve the registrant of responsibility if the  registrant knew, or should have known, that the controlled substances were  being diverted.
>
> The regulation specifically states that suspicious orders include orders of  unusual size, orders deviating substantially from a normal pattern, and  orders of an unusual frequency. These criteria are disjunctive and are not  all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should  be  reported as suspicious. Likewise, a registrant need not wait for a "normal  pattern" to develop over time before determining whether a particular order  is suspicious. The size of an order alone, whether or not it deviates from a  normal pattern, is enough to trigger the registrant's responsibility to report  the order as suspicious. The determination of whether an order is  suspicious  depends  not  only  on  the  ordering patterns  of  the  particular  customer, but also on the patterns of the registrant's customer base and the  patterns throughout the segment of

---

[76] *Id.*  at 2.

[77] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-  00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.

[78] *Id.*

the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a  system that identifies orders as suspicious only if the total amount of  a  controlled  substance  ordered  during  one  month  exceeds  the amount  ordered the previous month by a certain percentage or more is insufficient.

This  system  fails  to  identify  orders  placed  by  a  pharmacy  if  the pharmacy  placed  unusually  large  orders  from  the  beginning  of  its relationship  with  the distributor. Also, this system would not identify orders as suspicious if  the order were solely for one highly abused controlled  substance  if  the  orders  never  grew  substantially. Nevertheless, ordering one highly abused  controlled substance and little or nothing else deviates from the normal  pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an  order as suspicious. Daily, weekly, or monthly reports submitted by registrant  indicating  "excessive  purchases"  do  not  comply  with  the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other  than legitimate medical, scientific, and industrial channels, may be failing  to maintain effective controls against diversion. Failure to maintain  effective  controls  against  diversion  is  inconsistent  with  the public interest  as that term is used in 21 USC § 823 and 824, and may  result  in  the  revocation of the registrant's DEA Certificate of Registration.[79]

153.    Finally, the DEA letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.,* 72 Fed. Reg. 36, 487-01 (July 3, 2007), which discusses  the obligation to report suspicious orders and "some criteria to use when determining  whether an order is suspicious."[80]

---

[79] *Id.*

[80] *Id.*

154.    The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but  undertake such efforts as responsible members of society."[81]

155.    The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by  the  Healthcare  Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore  "are uniquely situated to perform due diligence in order to help support the security of the  controlled  substances they  deliver  to  their  customers."  The  guidelines  set  forth  recommended steps in the "due diligence" process, and note in particular: If an order meets  or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not  ship to the customer, in fulfillment of that order, any units of the specific drug code product  as to which the order met or exceeded a threshold or as to which the order was otherwise  characterized as an order of interest.[82]

156.    Each  of  the  Distributor  Defendants  sold  prescription  opioids,  including hydrocodone and/or oxycodone, to retailers in the Commonwealth of Kentucky and Inez and/or to  retailers  from which Defendants knew prescription opioids were likely to be diverted to the Commonwealth of Kentucky and Inez.

157.    Each Distributor Defendant owes a duty to monitor and detect suspicious orders of prescription opioids.

---

[81] *See* Brief of HDMA, *supra*, 2012 WL 1637016, at *2.

[82] Healthcare Distribution Management Association (HDMA) *Industry Compliance Guidelines: Reporting  Suspicious Orders and Preventing Diversion of Controlled Substances*, *filed in Cardinal Health, Inc. v. Holder*, No.  12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

158.    Each Distributor Defendant owes a duty under federal and state law to investigate and refuse suspicious orders of prescription opioids.

159.    Each Distributor Defendant owes a duty under federal and state law to report suspicious orders of prescription opioids.

160.    Each Distributor Defendant owes a duty under federal and state law to prevent the  diversion of prescription opioids into illicit markets in the Commonwealth of Kentucky and Inez.

161.    The foreseeable harm resulting from a breach of these duties is the diversion of  prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

162.    The foreseeable harm resulting from the diversion of prescription opioids for  nonmedical purposes is abuse, addiction, morbidity and mortality in Inez and the damages caused thereby.

163.    Because distributors handle such large volumes of controlled substances, and are  the first major line of defense in the movement of legal pharmaceutical controlled  substances from legitimate channels into the illicit market, it is incumbent on distributors   to maintain effective controls to prevent diversion  of  controlled  substances.  Should  a  distributor deviate from these checks and balances, the closed system collapses.[83]

164.    The sheer volume of prescription opioids distributed to pharmacies in the Plaintiff's community, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into Plaintiff's community, is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages

---

[83] *See* Rannazzisi Decl. ¶ 10, filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10,  2012), ECF No. 14-2.

in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[84]

165.     The Distributor Defendants failed to report "suspicious orders" originating from the Commonwealth of Kentucky and/or Inez, or which the Distributor Defendants  knew were likely to be diverted to Inez, to the federal and state authorities, including the DEA and/or the state Board of Pharmacy.

166.     The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in  the Commonwealth of Kentucky and Inez, and/or in areas from which the Distributor Defendants knew  opioids were likely to be diverted to Inez.

167.     The Distributor Defendants breached their duty to monitor, detect, investigate, refuse  and  report  suspicious  orders  of  prescription  opiates  originating  from  the Commonwealth  of  Kentucky  and/or  Inez,  and/or  in  areas  from  which  the  Distributor Defendants knew opioids were  likely to be diverted to Inez.

168.     The Distributor Defendants breached their duty to maintain effective controls against  diversion  of  prescription  opiates  into  other  than  legitimate  medical,  scientific,  and industrial channels.

169.     The Distributor Defendants breached their duty to "design and operate a system to  disclose to the registrant suspicious orders of controlled substances" and failed to inform  the authorities including the DEA of suspicious orders when discovered, in violation of  their duties under federal and state law.

170.     The  Distributor  Defendants  breached  their  duty  to  exercise  due  diligence  to

---

[84] *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55, 418-01, 55, 482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C.,d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62, 316, 62, 322 (2012)).

avoid  filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.[85]

171.    The federal and state laws at issue here are public safety laws.

172.    The Distributor Defendants' violations of public safety statutes constitute prima  facie evidence of negligence under State law.

173.    The unlawful conduct by the Distributor Defendants is purposeful and intentional.

174.    The Distributor Defendants refuse to abide by the duties imposed by federal and state law which are required to legally  acquire and maintain a license to distribute  prescription opiates.

175.    The Distributor Defendants acted with actual malice in breaching their duties, i.e., they have acted with a conscious disregard for the rights and safety of other persons, and  said actions have a great probability of causing substantial harm.

176.    The Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless  conduct or criminal indifference to civil obligations affecting the rights of others and  justifies an award of punitive damages.

177.    The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under state and federal law and have wrongfully and repeatedly  disavowed those duties in an effort to mislead regulators and the public regarding the  Distributor Defendants' compliance with their legal duties.

178.    Distributor Defendants have refused to recognize any duty beyond reporting

---

[85] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

suspicious orders. In Masters Pharmaceuticals, the HDMA, a trade association run by the Distributor Defendants, and the NACDS submitted amicus briefs regarding the legal duty of wholesale distributors. Inaccurately denying the legal duties that the wholesale drug industry has been tragically recalcitrant in performing, they argued as follows:

a. The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to investigate orders (e.g., by interrogating pharmacies and physicians) and take action to halt suspicious orders before they are filled;"[86]

b. The Associations argued that, "DEA now appears to have changed its position to require that distributors not only report suspicious orders, but investigate and halt suspicious orders. Such a change in agency position must be accompanied by an acknowledgment of the change and a reasoned explanation for it. In other words, an agency must display awareness that it is changing position and show that there are good reasons for the new policy. This is especially important here, because imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications;"[87]

c. The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious;"[88]

d. The Association complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that DEA has complied with the APA before attempting to impose such duties;"[89]

e. The Associations alleged (inaccurately) that "DEA's regulations sensibly impose a duty on distributors simply to report suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders;"[90] and

---

[86] Brief for HDMA and NACDS, *supra*, 2016 WL 1321983, at *4–5.

[87] *Id.* at *8.

[88] *Id.* at *14.

[89] *Id.* at *22.

[90] *Id.* at *24-25.

f. Also inaccurately, the Associations argued that, "[i]mposing a  duty on distributors – which lack the patient information and the  necessary medical expertise – to investigate and halt orders may  force  distributors  to take  a shot-in-the-dark  approach  to  complying with DEA's demands."[91]

179.    The positions taken by the trade groups is emblematic of the position taken by the Distributor Defendants in a  futile  attempt to deny  their  legal obligations to prevent  diversion of the dangerous drugs.[92]

180.    The Court of Appeals for the District of Columbia recently issued its opinion affirming that a wholesale drug distributor does, in fact, have duties beyond reporting. *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017). The D.C.  Circuit Court upheld the revocation of Master Pharmaceutical's license and determined  that DEA regulations require that in addition to reporting suspicious orders, distributors  must "decline to ship the order, or conduct some 'due diligence' and--if it is able to  determine that the order is not likely to be diverted into illegal channels--ship the order." *Id*. at 212. Master Pharmaceutical was in violation of legal requirements because it failed to  conduct  necessary  investigations  and  filled suspicious orders. *Id.* at 218–19, 226. A distributor's investigation must dispel all the red flags giving  rise  to  suspicious  circumstance prior to shipping a suspicious order. *Id*. at 226. The Circuit Court also rejected the argument made by the HDMA and NACDS (quoted above), that, allegedly, the DEA  had created or imposed new duties. *Id.* at 220.

181.    Wholesale Distributor McKesson has recently been forced to specifically admit to breach  of  its  duties  to  monitor,  report,  and  prevent  suspicious orders.  Pursuant to an Administrative  Memorandum  of  Agreement  ("2017 Agreement") entered  into  between

---

[91] *Id.* at *26.

[92] *See* Brief of HDMA, *supra*, 2012 WL 1637016, at *3 (arguing the wholesale distributor industry "does not know  the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

McKesson and the DEA in January 2017, McKesson admitted that, at various times during  the period from January 1, 2009 through the effective date of the Agreement (January 17,  2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies  which  should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[93] Further, the 2017 Agreement specifically finds that  McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution  Centers  should  have  known that the pharmacists practicing within those  pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled  substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R  §  1306.04(a)."[94] McKesson admitted that, during this time period, it "failed to   maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its  customers in violation of the CSA and the CSA's implementing regulations,  21 C.F.R. Part 1300 et seq., at the McKesson Distribution Centers."[95] Due to these violations, McKesson agreed that its authority to distribute controlled substances would be partially suspended.[96]

182.      The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which McKesson also admitted failure to report suspicious orders of controlled substances  to the DEA.[97] In the 2008 Settlement Agreement, McKesson "recognized that it had a duty  to monitor its

---

[93] *See* Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and  the McKesson Corp. (Jan. 17, 2017), https://www.justice.gov/opa/press-release/file/928476/download.

[94] *Id.* at 4.

[95] *Id.*

[96] *Id. at 6.*
[97] *Id.* at 4.

sales of all controlled substances and report suspicious orders to DEA," but had failed to do so.[98] The 2017 Memorandum of Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations."[99] As a result of these violations, McKesson was fined and required to pay to the United States $150,000,000.[100]

183.     Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

184.     Because of the Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.[101] The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate

---

[98] *Id.*

[99] *Id.*; *see also* Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter 2017 Settlement Agreement and Release] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), https://www.justice.gov/opa/press-release/file/928471/download.

[100] *See* 2017 Settlement Agreement and Release, *supra*, at 6.

[101] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

suspension orders.[102] These actions include the following:

    a.   on April 24, 2007, the DEA issued an Order to Show Cause and  Immediate Suspension Order against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion  of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

    b.   on November 28, 2007, the DEA issued an Order to Show Cause  and Immediate Suspension Order against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of  hydrocodone;

    c.   on December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of  hydrocodone;

    d.   on December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro  Facility") for failure to maintain effective controls against  diversion of hydrocodone;

    e.   on January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of  hydrocodone;

    f.   on May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement ("2008 MOA")  with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the  diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring  Program";

    g.   on September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its Auburn  Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities  located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver,  Colorado ("Denver Facility");

_____

[102] *Id.*

h. on February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. on December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. on January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

185. Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[103]

---

[103] *See* Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-   enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA EnforcementSlowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette Mail, Feb. 18, 2017,  http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

186.     In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

187.     For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[104] Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results.

188.     Similarly, Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[105] Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

189.     By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. The Plaintiff did not know of the

---

[104] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

[105] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

190.    The opioid epidemic continues unabated in the United States, the Commonwealth of Kentucky and Inez.

191.    The epidemic still continues because the fines and suspensions imposed by the DEA do not change the conduct of the industry. The distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

192.    The wrongful actions and omissions of the Distributor Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Inez's racketeering allegations set forth below.

193.    The Distributor Defendants have abandoned their duties imposed under federal and state law, taken advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in the Commonwealth of Kentucky and Inez.

194.    The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids that were incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under federal law.

195.    Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture schedule II controlled substances, like prescription opioids. See 21 U.S.C. § 823(a). A requirement of such registration is the:

> maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or

industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can  produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific,  research, and industrial purposes…

21 U.S.C. § 823(a)(1) (emphasis added).

196.    Additionally, as "registrants" under Section 823, the Manufacturer Defendants were also required to monitor, report, and prevent suspicious orders of controlled  substances:

The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74. *See also* 21 C.F.R. § 1301.02 ("Any term used in this part shall have  the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this  chapter."); 21 C.F.R. § 1300.01 ("Registrant means any person who is registered pursuant  to  either  section 303 or section 1008 of the Act (21 U.S.C. 823 or 958)." Like the Distributor Defendants, the Manufacturer Defendants breached these duties.

197.    The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor  requests  a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which  it sold the product. Thus, the Manufacturer Defendants knew – just as the Distributor Defendants knew – the volume,

frequency, and pattern of opioid orders being placed and  filled.  The Manufacturer Defendants built receipt of this information into the payment  structure for the opioids provided to the opioid distributors.

198.    Federal statutes and regulations are clear: just like opioid distributors, opioid manufacturers are required to "design and operate a system to disclose . . . suspicious orders  of controlled substances" and to maintain "effective controls against diversion." 21 C.F.R. § 1301.74; 21 U.S.C. § 823(a)(1).

199.    The Department of Justice has recently confirmed the suspicious order obligations clearly imposed by federal law upon opioid manufacturers, fining Mallinckrodt $35 million  for failure to report suspicious orders of controlled substances, including opioids, and for  violating recordkeeping requirements.[106]

200.    In the press release accompanying the settlement, the Department of Justice stated: Mallinckrodt did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring requirements exist to prevent excessive sales  of controlled substances, like oxycodone . . . . Mallinckrodt's actions and omissions formed  a link in the chain of supply that resulted in millions of oxycodone pills being sold on the  street. . . . "Manufacturers and distributors have a crucial responsibility to ensure that  controlled substances do not get into the wrong hands. . . ."[107]

201.    Among the allegations resolved by the settlement, the government alleged

---

[106] *See* Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure   to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017),   https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders

[107] *Id.*

"Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances – orders that are unusual in their frequency,  size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[108]

202.     The Memorandum of Agreement entered into by Mallinckrodt ("2017 Mallinckrodt MOA") avers "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and  monitor these sales and report suspicious orders to DEA."[109]

203.     The 2017 Mallinckrodt MOA further details the DEA's allegations regarding Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer:

204.     With respect to its distribution of oxycodone and hydrocodone products, Mallinckrodt's alleged failure to distribute these controlled substances in a manner  authorized by its registration and failure to operate an effective  suspicious order monitoring system and to report suspicious orders to the DEA when  discovered as required by and in violation of 21 C.F.R. § 1301.74(b). The above includes,  but is not limited to Mallinckrodt's alleged failure to:

   a.  conduct adequate due diligence of its customers;

   b.  detect and report to the DEA orders of unusual size and  frequency;

   c.  detect and report to the DEA orders deviating substantially from  normal patterns including, but not limited to, those identified in  letters from the DEA Deputy Assistant Administrator, Office of  Diversion Control, to registrants dated September 27, 2006 and  December 27, 2007:

---

[108] *Id.*

[109] Administrative Memorandum of Agreement between the United States Department of Justice, the Drug  Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC (July 10, 2017),  https://www.justice.gov/usao-edmi/press-release/file/986026/download. ("2017 Mallinckrodt MOA").

      i. orders that resulted in a disproportionate amount of a substance which is most often abused going to a particular geographic region where there was known diversion,

      ii. orders that purchased a disproportionate amount of a substance which is most often abused compared to other products; and

      iii. orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;

d. use "chargeback" information from its distributors to evaluate suspicious orders. Chargebacks include downstream purchasing information tied to certain discounts, providing Mallinckrodt with data on buying patterns for Mallinckrodt products; and

e. take sufficient action to prevent recurrence of diversion by downstream customers after receiving concrete information of diversion of Mallinckrodt product by those downstream customers.[110]

205. Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007." Mallinckrodt further agreed that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and would "design and operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product. Further, Mallinckrodt agrees to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."[111]

206. Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt

---

[110] 2017 Mallinckrodt MOA at p. 2-3.

[111] *Id.* at 3-4.

collects transaction information, referred to as chargeback data, from their direct customers (distributors). The transaction information contains data relating to the direct customer sales of controlled substances to "downstream" registrants." Mallinckrodt agreed that, from this data, it would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[112]

207.    The same duties imposed by federal law on Mallinckrodt were imposed upon all Distributor Defendants.

208.    The same business practices utilized by Mallinckrodt regarding "charge backs" and receipt and review of data from opioid distributors regarding orders of opioids were utilized industry-wide among opioid manufacturers and distributors, including, upon information and belief, the other Distributor Defendants.

209. Through, *inter alia*, the charge back data, the Manufacturer Defendants could monitor suspicious orders of opioids.

210. The Manufacturer Defendants failed to monitor, report, and halt suspicious orders of opioids as required by federal law.

211.    The Manufacturer Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

212.    The Manufacturer Defendants misrepresented their compliance with federal law.

213.    The wrongful actions and omissions of the Manufacturer Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations below.

---

[112] *Id.*

214.     The Manufacturer Defendants' actions and omissions in failing to effective prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the  unlawful diversion of opioids into Inez.

215.     As the Manufacturer Defendants' efforts to expand the market for opioids increased so have the rates of prescription and sale of their products — and the rates of opioid- related substance abuse, hospitalization, and death among the people of the Commonwealth of  Kentucky and Inez. The Distributor Defendants have continued to unlawfully ship these massive  quantities of opioids into communities like the Plaintiff's Community, fueling the  epidemic.

216.     The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[113]

217.     The  increased abuse  of prescription painkillers along  with growing  sales has contributed to a large number of overdoses and deaths.[114]

218.     Because of the well-established relationship between the use of prescription opiates and the use of non-prescription opioids, like heroin, the large-scale distribution of opioids to the Commonwealth of Kentucky and  Inez and areas from which such opioids are being diverted into Plaintiff's  Community,  has  caused  the  Defendant-caused  opioid  epidemic  to  include  heroin addiction,  abuse, and death.

219.     Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and in Plaintiff's Community.

220.     Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety in the Commonwealth of Kentucky and Inez.

---

[113] *See* Califf et al., *supra.*

[114] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *supra.*

221.     Defendants repeatedly and purposefully breached their duties under state and federal law, and such breaches are direct and proximate causes of, and/or substantial factors  leading to, the widespread diversion of prescription opioids for nonmedical purposes into  Inez.

222.     The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse,  addiction, morbidity and mortality in the Commonwealth of Kentucky and Inez. This diversion  and  the epidemic are direct causes of foreseeable harms incurred by the Plaintiff.

223.     Defendants intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Plaintiff seeks relief, as alleged herein.

224.     Plaintiff also seeks the means to abate the epidemic created by  Defendants' wrongful and/or unlawful conduct.

225.     These community-based problems require community-based solutions that have been limited by "budgetary constraints at the State and Federal levels."[115]

226.     Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon the Plaintiff and  Plaintiff's Community.

227.     Plaintiff contends it continues to suffer harm from the unlawful actions by the Defendants.

228.     The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to  occur and have increased as time progresses. The tort is not completed nor have all the  damages been

---

[115] *See* Office of Nat'l Drug Control Policy, Exec. Office of the President, *Epidemic: Responding to America's  Prescription Drug Abuse Crisis* (2011), https://www.ncjrs.gov/pdffiles1/ondcp/rx_abuse_plan.pdf.

incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants has not ceased. The public nuisance remains unabated.

229.     Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including the Commonwealth of Kentucky and Inez, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits. Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the Commonwealth of Kentucky and Inez, that they are working to curb the opioid epidemic.

230.     The Distributor Defendants have also concealed and prevented discovery of information, including data from the ARCOS database, that will confirm their identities and the extent of their wrongful and illegal activities.

231.     The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community. Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The medical community, consumers, the Commonwealth of Kentucky and Inez were duped by the Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the Commonwealth of Kentucky and

Inez.

232.    Inez reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

233.    The Plaintiff's claims are further subject to equitable tolling, stemming from Defendants' knowingly and fraudulently concealing the facts alleged herein. As alleged herein, Defendants knew of the wrongful acts set forth above, and had material information pertinent to their discovery, and concealed them from the Plaintiff. The Plaintiff did not know or could not have known through the exercise of reasonable diligence, of its cause of action, as a result of Defendants' conduct.

234.    The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

235.    In light of their statements to the media, in legal filings, and settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

236.    Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, the Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

## V.  CAUSES OF ACTION

### COUNT I
### PUBLIC NUISANCE
### (Against All Defendants)

237.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully  set forth herein, and further alleges as follows.

238.    Defendants, individually and acting through their employees and agents, and in concert  with each other, have engaged in conduct or omissions which endanger or injure  the property, health, safety or comfort of a considerable number of persons in Plaintiff's community by their production, promotion, and marketing of opioids for use by residents  of Inez.

239.    Defendants' actions have caused hurt, inconvenience and damage to all members of the public.

240.    Defendants' conduct and subsequent sale of its opioid products is not only unlawful, but has also resulted in substantial and unreasonable interference with the public   health and safety.

241.    Defendants' conduct is not insubstantial or fleeting.  Defendants' unlawful  conduct has so severely impacted public health on every geographic and demographic level  that the public nuisance  perpetrated  by  Defendants'  conduct  is  commonly  referred  to  as  a   "crisis"  or  an "epidemic." It has caused deaths, serious injuries, and a severe disruption of  public peace, order and safety; it is ongoing, and it is producing permanent and long-lasting  damage.

242.    Defendants' actions have created a public nuisance.

243.    The public nuisance created by Defendants is within the control of the Defendants.

244.    The public nuisance created by Defendants is the result of repeated and continuing conduct which requires the expenditure of funds by Plaintiff on an ongoing and continuous  basis.

245.    Defendants  intentionally,  unlawfully,  and  recklessly  manufacture,  market, distribute, and sell prescription opioids that Defendants know, or reasonably should know,  will be diverted,  causing  widespread  distribution  of  prescription  opioids  in  and/or  to  Inez, resulting in addiction and abuse, an elevated level of crime, death  and injuries to the residents of Inez, a

higher level of fear, discomfort and inconvenience to the residents of Inez, and direct costs to Plaintiff.

246.    Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted so as to injure Inez and its residents.

247.    Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion. Such conduct was illegal. Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

248.    Defendants have caused a significant and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property.

249.    Defendants' conduct in illegally distributing and selling prescription opioids, or causing such opioids to be distributed and sold, where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally in Inez is of a continuing nature.

250.    Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

251.    A violation of any rule or law controlling the distribution of a drug of abuse in the Commonwealth of Kentucky and Inez is a public nuisance.

252.    Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

253.    Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Inez will be

diverted, leading to abuse, addiction, crime, and public health costs.

254.    Because of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to  person and property.

255.    Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the public's  ability to be free from disturbance and reasonable apprehension of danger to person and  property.

256.    Defendants know, or reasonably should know, that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and  property.

257.    Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in Inez.  Defendants are in the business of manufacturing, marketing, selling, and distributing  prescription drugs, including opioids, which are specifically known to Defendants to be  dangerous under federal law. See, e.g., 21 U.S.C. § 812(b)(2).

258.    Defendants' conduct in marketing, distributing, and selling prescription opioids which the defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, is reasonably foreseeable and creates a strong likelihood that these illegal distributions of  opioids will cause death and injuries to residents in Inez and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with  the public's right to be free from disturbance and reasonable apprehension of danger to  person and property.

259.    Defendants' conduct makes it easier for persons to divert prescription opioids,

constituting a dangerous threat to the public.

260.    Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

261.    The presence of diverted prescription opioids in Inez, and the consequence of prescription opioids having been diverted in Inez, proximately results in significant costs to the Plaintiff in order to enforce the law, equip its police force and treat the victims of opioid abuse and addiction.

262.    Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make Inez a safer place to live.

263.    Defendants' conduct is a direct and proximate cause of deaths and injuries to the residents of Inez, costs borne by Inez, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

264.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the residents of Inez, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. Plaintiff has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

265.    Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids

would create in Inez.  However, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids, or caused such orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

266.    Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in Inez.

267.    Defendants acted recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

268.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

269.    The damages available to the Plaintiff include, *inter alia*, recoupment of governmental costs, flowing from an ongoing and persistent public nuisance which the government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiff seeks all damages flowing from Defendants' conduct.

270.    Plaintiff seeks to abate the nuisance and harm created by Defendants' conduct.

271.    As a direct result of Defendants' conduct, the Plaintiff has suffered actual injury

and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services.

272. The Plaintiff has sustained specific and special injuries because its damages include, inter alia, health services, law enforcement expenditures, and costs related to opioid addiction treatment and overdose prevention.

273. The Plaintiff further seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and interference with a right common to the public.

274. Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia abatement, compensatory damages, and punitive damages from the Defendants for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

275. Defendants' intentional and unlawful actions and omissions and unreasonable interference with a right common to the public are of a continuing nature.

276. Defendants are aware, and at a bare minimum should be aware, of the unreasonable interference that their conduct has caused in Inez. Defendants are in the business of manufacturing or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because inter alia these drugs are defined under federal and state law as substances posing a high potential for abuse and severe addiction. Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

277. The public nuisance created by Defendants' actions is substantial and unreasonable, has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Defendants' abdication of their gate-keeping and diversion prevention duties, and the

Manufacturer  Defendants'  fraudulent  marketing  activities,  have  caused   harm to the entire community that includes, but is not limited to:

    a.  the high  rates  of  use  leading  to  unnecessary  opioid  abuse,  addiction, overdose, injuries, and deaths;

    b.  even children  have  fallen  victim  to  the  opioid  epidemic.  Easy  access  to prescription opioids made opioids a recreational drug of  choice  among teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

    c.  even those residents of Plaintiff's Community who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate- keeper duties and fraudulent promotions. Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids;

    d.  the opioid epidemic has increased health care costs;

    e.  employers have lost the value of productive and healthy employees;

    f.  defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury;

    g.  Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result;

    h.  the diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement;

    i.  the significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiff's Community; and

    j.  Defendants' interference with the comfortable enjoyment of life in the Plaintiff's Community is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

278.     Plaintiff has sustained, and continues to sustain,  specific and special injuries because its damages include inter alia law  enforcement expenditures and other services, as described in this Complaint.

279.     Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity and fraudulent misrepresentations.  Plaintiff does not seek damages for the wrongful death, physical personal injury, serious  emotional distress, or any physical damage to property caused by Defendants' actions.

280.     Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement  of profits, compensatory and punitive damages, and all damages allowed by law to be paid  by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT II
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. 1961, et seq., KRS 506.120, et seq.
### (Against All Defendants)

281.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully  set forth herein, and further alleges as follows.

282.     Plaintiff brings this Count on behalf of itself against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, Insys, McKesson, Cardinal, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

283.     The RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a  legal entity enterprise. At all relevant times, the RICO Defendants were "persons" under  18 U.S.C. § 1961(3) and KRS 506.120, et seq. and because they are entities capable of holding,  and do hold,

"a legal or beneficial interest in property."

284.    Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c); *United State v. Turkette*, 452 U.S. 576, 580 (1981).

285.    The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Turkette,* 452 U.S. at 580; *Boyle v. U.S.*, 556 U.S. 938, 944 (2009). The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within its scope. Specifically, the section "describes two separate categories of associations that come within the purview of an 'enterprise' -- the first encompassing organizations such as corporations, partnerships, and other 'legal entities,' and the second covering 'any union or group of individuals associated in fact although not a legal entity.'" *Turkette*, 452 U.S. at 577. The second category is not a more generalized description of the first. Id.

286.    For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the RICO Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. As "registrants," the RICO Defendants operated and continue to operate within the "closed-system" created under the Controlled Substances Act, 21 U.S.C. § 821, et seq. (the "CSA"). The CSA restricts the RICO Defendants' ability to manufacture or distribute Schedule II substances like opioids by requiring them to: (1) register

to manufacture or distribute opioids; (2) maintain effective  controls against diversion of the controlled substances that they manufacturer or distribute; (3) design and operate a system to identify suspicious orders of controlled substances, halt  such unlawful sales, and report them to the DEA; and (4) make sales within a limited quota  set by the DEA for the overall production of Schedule II substances like opioids.

287.    The closed-system created by the CSA, including the establishment of quotas, was specifically intended to reduce or eliminate the diversion of Schedule II substances like  opioids from "legitimate channels of trade" to the illicit market by controlling the quantities  of the basic ingredients needed for the manufacture of [controlled substances]."[116]

288.    Finding it impossible to legally achieve their ever increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and  fraudulently violated their statutory duty to maintain effective controls against diversion of  their drugs, to design and operate a system to identify suspicious orders of their drugs, to  halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders.[117] As discussed in detail below, through the RICO Defendants' scheme, members of the Opioid  Diversion Enterprise repeatedly engaged in unlawful sales of painkillers which, in turn,  artificially and illegally increased the annual production quotas for opioids allowed by the  DEA.[118] In doing so, the RICO Defendants allowed hundreds of millions of pills to enter  the illicit market which allowed them to generate large profits.

---

[116] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International  Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[117] 21 U.S.C. § 823(a)(1), (b)(1); 21 C.F.R. § 1301.74(b)-(c).

[118] 21 C.F.R. § 1303.11(b); 21 C.F.R. § 1303.23.

289.    Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants, and executed in  perfect harmony by each of them. In particular, each of the RICO Defendants were  associated with, and conducted or participated in, the affairs of the RICO enterprise  (defined below and referred to collectively as the "Opioid Diversion Enterprise"), whose  purpose was to engage in the unlawful sales of opioids, deceive the public and federal and  state regulators into believing that the RICO Defendants were faithfully fulfilling their  statutory obligations. The RICO Defendants' scheme allowed them to make billions in  unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with  the purpose of ensuring unlawfully increasing revenues, profits, and market share. As a  direct result of the RICO Defendants' fraudulent scheme, course of conduct, and pattern of  racketeering activity, they were able to extract billions of dollars of revenue from the  addicted American public, while entities like the Plaintiff experienced tens of millions of  dollars of injury caused by the reasonably foreseeable consequences of the prescription  opioid addiction epidemic. As explained in detail below, the RICO Defendants'  misconduct violated Section 1962(c) and Plaintiff is entitled to treble damages for its injuries under 18 U.S.C. § 1964(c).

290.    Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted  their pattern of racketeering activity in this jurisdiction and throughout the United States.  Specifically, the Healthcare Distribution Alliance (the "HDA")[119] is a distinct legal entity  that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation  formed under the laws

---

[119] Health Distribution Alliance, <u>History</u>, Health Distribution Alliance, (last accessed on April 9, 2018), https://www.healthcaredistribution.org/about/hda-history.

of the District of Columbia and doing business in Virginia. As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in 18 U.S.C. § 1961(4) because it is a corporation and a legal entity.

291.    On information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

292.    Each of the RICO Defendants is a legal entity separate and distinct from the HDA. And, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

293.    The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

## A.    The Opioid Diversion Enterprise

294.    Recognizing that there is a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.[120] The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.[121]

---

[120] Joseph T. Rannazzisi Decl. ¶ 4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

[121] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566.

Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.[122] As reflected in comments from United States Senators during deliberation on the CSA, the "[CSA] is designed to crack down hard on the narcotics pusher and the illegal diverters of pep pills and goof balls."[123] Congress was concerned with the diversion of drugs out of legitimate channels of distribution when it enacted the CSA and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[124] Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain.[125] All registrants -- manufacturers and distributors alike --must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion.[126] When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse.[127] The result is the scourge of addiction that has occurred.

---

[122] *Gonzalez v. Raich*, 545 U.S. 1, 12-14 (2005); 21 U.S.C. § 801(20; 21 U.S.C. §§ 821-824, 827, 880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970).

[123] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 116 Cong. Rec. 977-78 (Comments of Sen. Dodd, Jan 23, 1970).

[124] See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[125] See Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control United States Senate, July 18, 2012 (available at https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/07/18/12/07-18-12-dea-rannazzisi.pdf).

[126] *Id.*

[127] Joseph T. Rannazzisi Decl. ¶ 10, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

295.    In 2006 and 2007, the DEA issued multiple letters to the Distributor Defendants reminding them of their obligation to maintain effective controls against diversion of particular controlled substances, design and operate a system to disclose suspicious orders, and to inform the DEA of any suspicious orders.[128] The DEA also published suggested questions that a distributor should ask prior to shipping controlled substances, in order to "know their customers."[129]

296.    Central to the closed-system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs."[130] When evaluating production quotas, the DEA was instructed to consider the following information:

    a.   information provided by the Department of Health and Human Services;

    b.   total net disposal of the basic class by all manufacturers;

    c.   trends in the national rate of disposal of the basic class;

    d.   an applicant's production cycle and current inventory position; and

    e.   total actual or estimated inventories of the class and of all substances manufactured from the class and trends in inventory accumulation.

297.    Other factors included changes in the currently accepted medical use of substances

---

[128] Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (September 27, 2006); Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (December 27, 2007).

[129] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf).

[130] 1970 U.S.C.C.A.N. 4566 at 5490; see also Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

manufactured for a basic class; the economic and physical availability of raw materials;  yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.[131]

298.    It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a  quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.[132]

299.    At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt and report suspicious orders  of opioids and diversion of their drugs into the illicit market, in order to unlawfully increase  the quotas set by the DEA and allow them to collectively benefit from the unlawful  formation of a greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and  throughout the United States through this enterprise.

300.    The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, per capita purchase of methadone, hydrocodone, and oxycodone increased 13-fold, 4-fold,  and 9-fold, respectively. By 2010, enough prescription opioids were sold in the United  States to medicate every adult in the country with a dose of 5 milligrams of hydrocodone  every 4 hours for 1 month.[133] On information and belief, the Opioid Diversion Enterprise  has been ongoing for at

---

[131] See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State  Senate, May 5, 2015 (available at
https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[132] Id. (citing 21 U.S.C. 842(b)).

[133] Keyes KM, Cerdá M, Brady JE, Havens JR, Galea S. Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States. Am J Public Health. 2014;104(2):e52-9.

least the last decade.[134]

301.    The Opioid Diversion Enterprise was and is a shockingly successful endeavor. It has been conducting business uninterrupted since its genesis.  But, it was not until recently that United States and State regulators finally began to unravel  the extent of the enterprise and the toll that it exacted on the American public.

302.    At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) characterized by interpersonal relationships among the RICO Defendants; (e) had  sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a  continuing unit. *Turkette*, 452 U.S. at 580; *Boyle*, 556 U.S. at 944 (2009). Each member  of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including  patterns of racketeering activity, and shared in the astounding growth of profits supplied  by  fraudulently  inflating opioid sales generated as a result of the Opioid Diversion  Enterprise's disregard for their duty to  prevent diversion of their drugs into the illicit  market and then requesting the DEA increase production quotas, all so that the RICO  Defendants would have a larger pool of prescription opioids from which to profit.

303.    The Opioid Diversion Enterprise also engaged in efforts to lobby against the DEA's authority to hold the RICO Defendants liable for disregarding their duty to prevent diversion.

---

[134] Matthew Perrone, <u>Pro-Painkiller echo chamber shaped policy amid drug epidemic</u>, The Center for Public  Integrity (April 9, 2018), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

Members of the Pain Care Forum (described in greater detail below) and the Healthcare Distribution Alliance lobbied for the passage of legislation to weaken the DEA's enforcement authority. The Ensuring Patient Access and Effective Drug Enforcement Act significantly reduced the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations.[135] The HDA and other members of the Pain Care Forum contributed substantial amounts of money to political campaigns for federal candidates, state candidates, political action committees and political parties. Plaintiff is informed and believes that the Pain Care Forum and its members poured at least $3.5 million into lobbying efforts in this jurisdiction while the HDA devoted over a million dollars a year to its lobbying efforts between 2011 and 2016.

304.    The Opioid Diversion Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity, that involves a fraudulent scheme to increase revenue by violating State and Federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market.

---

[135] *See* HDMA is now the Healthcare Distribution Alliance, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution- alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-pidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills.

The goal of Defendants' scheme was to increase profits from opioid sales. But, Defendants' profits were limited by the production quotas set by the DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

305.    The Opioid Diversion Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across states lines, such as manufacture, sale, distribution, and shipment of prescription opioids throughout the city and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

306.    Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

307.    Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

308.    The RICO Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

309.    The Pain Care Forum ("PCF") has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

310.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[136] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[137]

311.    Not surprisingly, each of the RICO Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.[138] In 2012, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen

---

[136] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic (emphasis added).

[137] Id.

[138] PAIN CARE FORUM 2012 Meetings Schedule, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf

Pharmaceuticals), Actavis (i.e., Allergan), and Teva (the parent company of Cephalon).[139] Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[140] Plaintiff is informed and believes that the Distributor Defendants participated directly in the PCF as well.

312.    The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on the subject of the Defendants' interpersonal relationships. The meeting schedule indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless otherwise noted. Local members were "encouraged to attend in person" at the monthly meetings. And, the meeting schedule indicates that the quarterly and year-end meetings included a "Guest Speaker."

313.    The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drugmakers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted lobbying efforts that the PCF undertook on behalf of its members.

314.    Second, the HDA – or Healthcare Distribution Alliance – led to the formation of

---

[139] *Id*. Plaintiff is informed and believes that Mallinckrodt became an active member of the PCF sometime after 2012.

[140] *Id*. The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation. Executive Committee, Healthcare Distribution Alliance (accessed on April 9, 2018), https://www.healthcaredistribution.org/about/executive-committee.

interpersonal relationships and an organization between the RICO Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint, including Actavis (i.e., Allergan), Endo, Purdue, Mallinckrodt and Cephalon were members of the HDA.[141] And, the HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

315. In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[142] Clearly, the HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

316. The application for manufacturer membership in the HDA further indicates the level of connection that existed between the RICO Defendants.[143] The manufacturer

---

[141] Manufacturer Membership, Healthcare Distribution Alliance, (accessed on April 9, 2018), https://www.healthcaredistribution.org/about/membership/manufacturer.

[142] Manufacturer Membership Benefits, Healthcare Distribution Alliance, (accessed on April 9, 2018), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en.

[143] Manufacturer Membership Application, Healthcare Distribution Alliance, (accessed on September 14, 2017),

membership application must be signed by a "senior company executive," and it requests  that the manufacturer applicant identify a key contact and any additional contacts from  within its company.  The HDA application also requests that the manufacturer identify its  current distribution information and its most recent year end net sales through any HDA  distributors, including but not limited to, Defendants AmerisourceBergen, Cardinal Health,  and McKesson.[144]

317.    After becoming members, the Distributors and Manufacturers were eligible to participate on councils, committees, task forces and working groups, including:

   a.  Industry Relations Council: "This council, composed of  distributor and manufacturer members, provides leadership on  pharmaceutical distribution and supply chain issues;"[145]

   b.  Business Technology  Committee: "This committee provides  guidance to HDA and its members through the development of  collaborative e-commerce business solutions.  The  committee's  major areas of focus within pharmaceutical  distribution  include  information systems, operational integration and the impact of  e-commerce." Participation in  this committee includes  distributors and manufacturer members;[146]

   c.  Health, Beauty and Wellness Committee: "This committee  conducts research, as well as creates and exchanges industry  knowledge to help shape the future of the distribution for health,  beauty and wellness/consumer products in the healthcare supply   chain." Participation in this committee includes distributors and  manufacturer members;[147]

   d.  Logistics Operation Committee: "This committee initiates projects designed to  help members enhance the  productivity, efficiency and customer satisfaction within the healthcare supply chain.  Its  major  areas  of  focus

---

https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.

[144] *Id.*

[145] Councils and Committees, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/councils-and-committees

[146] *Id.*

[147] *Id.*

include   process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributors and manufacturer members;[148]

e.  Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members;[149]

f.  Bar Code Task Force: Participation includes Distributor, Manufacturer and Service Provider Members;[150]

g.  eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members;[151]

h.  ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members; and[152]

i.  Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation includes Distributor and Manufacturer Members.[153]

318.   The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

---

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] *Id.*

[153] *Id.*

319.    The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA, and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues," giving the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[154] The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership. And, it is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[155]

320.    Third, the RICO Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

321.    The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[156]

---

[154] Business and Leadership Conference – Information for Manufacturers, Healthcare Distribution Alliance,  (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.

[155] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on September 14, 2017),  https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

[156] Lenny Bernstein & Scott Higham, The government's struggle to hold opioid manufacturers accountable, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.cd8b791812cab24cc81cc356; see also, Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letters From Sen. Claire McCaskill, (March 28, 2017),  https://www.mccaskill.senate.gov/opioid-investigation; Purdue Managed Markets, Purdue Pharma, (accessed on September 14, 2017), http://www.purduepharma.com/payers/managed-markets/.

As reported in the Washington Post, identified by Senator McCaskill, and acknowledged by the HDA, there is an industry-wide practice whereby the Manufacturers  paid the Distributors rebates and/or chargebacks on their prescription opioid sales.[157] On  information and belief, these contracts were negotiated at the highest levels, demonstrating   ongoing relationships between the Manufacturer and Distributor Defendants. In return for   the rebates and chargebacks, the Distributor Defendants provided the Manufacturer  Defendants with detailed information regarding their prescription opioid sales, including   purchase  orders, acknowledgements, ship notices, and invoices.[158] The  Manufacturer  Defendants used this information to gather high-level data regarding overall distribution   and  direct  the  Distributor  Defendants  on  how  to  most effectively sell the prescription  opioids.

322.    The contractual relationships among the RICO Defendants also include vault security programs. The RICO Defendants are required to maintain certain security  protocols  and storage facilities for the manufacture and distribution of their opiates.  Plaintiff is informed and believes that manufacturers negotiated agreements whereby the  Manufacturers  installed security  vaults  for  Distributors  in  exchange  for  agreements  to   maintain  minimum  sales performance thresholds. Plaintiff is informed and believes that  these agreements were used by the RICO Defendants as a tool to violate their reporting and  diversion duties in order to reach the required sales requirements.

323.    Taken together, the interaction and length of the relationships between and among the  Manufacturer  and  Distributor  Defendants  reflects  a  deep  level  of  interaction  and cooperation between two groups in a tightly knit industry. The Manufacturer and  Distributor

---

[157] *Id.*

[158] <u>Webinars</u>, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

Defendants were not two separate groups operating in isolation or two groups  forced to work together in a closed system. The RICO Defendants operated together as a  united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships, and concerted joint efforts to accomplish common goals and  demonstrates that the leaders of each of the RICO Defendants was in communication and  cooperation.

324. According to articles published by the Center for Public Integrity and The Associated Press, the Pain Care Forum -- whose members include the Manufacturers and  the Distributors' trade association has been lobbying on behalf of the Manufacturers and Distributors for "more than a decade."[159] And, from 2006 to 2016 the Distributors and  Manufacturers worked together through the Pain Care Forum to spend over $740 million  lobbying in the nation's capital and in all 50 statehouses on issues including opioid-related  measures.[160] Similarly,  the  HDA  has continued its work on behalf of Distributors and  Manufacturers, without interruption, since at least 2000, if not longer.[161]

325.    As described above, the RICO Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to promote the common purpose of their enterprise. Plaintiff is informed and believes that the RICO Defendants worked together as  an ongoing and continuous organization throughout the existence of their enterprise.

B.    Conduct of The Opioid Diversion Enterprise

---

[159] Matthew Perrone, Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

[160] Id.

[161] HDA History, Healthcare Distribution Alliance, (accessed on April 9, 2018), https://www.healthcaredistribution.org/about/hda-history.

326.     During the time period alleged in this Complaint, the RICO Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by  fraudulently failing to comply with their Federal and State obligations to identify,  investigate and report suspicious orders of opioids in order to prevent diversion of those  highly addictive substances into the illicit market, to halt such unlawful sales and, in doing  so, to increase production quotas and generate unlawful profits, as follows:

327.     Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against  diversion of their prescription opioids.

328.     Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose  to the registrant suspicious orders of their prescription opioids.

329.     Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders  or diversion of their prescription opioids.

330.     Defendants paid nearly $800 million dollars to influence local, state and federal governments through joint lobbying efforts as part of the Pain Care Forum. The RICO Defendants were all members of their Pain Care Forum either directly or indirectly through  the HDA. The lobbying efforts of the Pain Care Forum and its members, included efforts  to pass legislation making it more difficult for the DEA to suspend and/or revoke the  Manufacturers' and Distributors' registrations for failure to report suspicious orders of  opioids.

331.     The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

332.     The RICO Defendants applied political and other pressure on the DOJ and DEA to

halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[162]

333.    The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Plaintiff is informed and believes that the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. And, Plaintiff is informed and believes that the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

334.    The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the RICO Defendants.

335.    The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007 was intended to help the RICO Defendants identify suspicious orders or customers who were likely

---

[162] *See* <u>HDMA is now the Healthcare Distribution Alliance</u>, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills.

to divert prescription opioids.[163] On information and belief, the "know your  customer" questionnaires informed the RICO Defendants of the number of pills that the  pharmacies sold, how many non-controlled substances are sold compared to controlled substances,  whether the pharmacy buys from other distributors, the types of medical  providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of  suspicious orders.

336.     The RICO Defendants refused to identify, investigate and report suspicious orders to the DEA when they became aware of the same despite their actual knowledge of drug  diversion rings. The RICO Defendants refused to identify suspicious orders and diverted  drugs despite the DEA issuing final decisions against the Distributor Defendants in 178  registrant actions between 2008 and 2012[164] and 117 recommended decision in registrant  actions from The Office of Administrative Law Judges. These numbers include 76 actions   involving orders to show cause and 41 actions involving immediate suspension orders --  all for failure to report suspicious orders.[165]

337.     Defendants' scheme had decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The  Manufacturer Defendants worked together to control the State and Federal Government's  response to the

---

[163] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf); Richard Widup, Jr., Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion: Beyond the PDMA, Purdue Pharma and McQuite Woods LLC,(available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

[164] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement  Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[165] *Id.*

manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion, and identify suspicious orders and report them to the DEA.

338.     The RICO Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was pro-opioid.   The Manufacturer and Distributor Defendants did this through their participation in the Pain Care Forum and Healthcare Distributors Alliance.

339.     The RICO Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no basis for refusing to increase or decrease the production quotas for prescription opioids due to diversion of suspicious orders. The RICO Defendants influenced the DEA production quotas in the following ways:

   a. the Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

   b. the Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the councils, committees, task forces, and working groups;

   c. the Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioids prescriptions filled by the Distributor Defendants;

   d. the Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

   e. the Manufacturer Defendants obtained sales information from QuintilesIMS (f/k/a IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids."[166]

---

[166] Harriet Ryan, et al., <u>More than 1 million OxyContin pills ended up in the hands of criminals and</u>

    f.   the Distributor Defendants accepted rebates and chargebacks for  orders of prescription opioids;

    g.   the Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the  Distributor Defendants to focus their distribution efforts to  specific areas where the purchase of prescription opioids was  most frequent;

    h.   RICO  Defendants identified suspicious orders of  prescription opioids and continued filling those unlawful  orders, without reporting them, knowing that  they  were  suspicious and/or being diverted into the illicit drug market;

    i.   the RICO Defendants refused to report suspicious orders of prescription opioids  despite  repeated  investigation  and  punishment of the Distributor Defendants by the DEA for failure  to report suspicious orders; and

    j.   the RICO Defendants withheld information regarding  suspicious orders and illicit diversion from the DEA because it  would have revealed that the "medical  need" for and  the  net disposal of their drugs did not justify the production quotas set  by the DEA.

340.    The scheme devised and implemented by the RICO Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all  designed and operated to ensure  the continued unlawful  sale of controlled substances.

### C.    Pattern of Racketeering Activity

341.    The RICO Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. §  1961(B), including  mail  fraud (18 U.S.C. § 1341) and wire  fraud (18 U.S.C. § 1343); and 18 U.S.C. § 1961(D) by the felonious  manufacture, importation, receiving, concealment buying selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

---

addicts. What the drugmaker knew, Los Angeles Times, (July 10, 2016),
http://www.latimes.com/projects/la-me-oxycontin-part2/

342.    The RICO Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, and the American public by knowingly conducting or  participating in  the  conduct  of  the  Opioid  Diversion  Enterprise  through  a  pattern  of  racketeering  activity within the meaning of 18 U.S.C. § 1961(1) that employed the use of  mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire  fraud).

343.    The RICO Defendants committed, conspired to commit, and/or aided and abetted in  the commission of at least  two predicate acts  of racketeering activity (i.e. violations of   18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of,  were related to each other,  posed  a  threat  of  continued  racketeering  activity,  and  therefore  constitute  a  "pattern  of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Diversion Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires  in interstate or foreign commerce.

344.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually  uniform misrepresentations,  concealments  and  material  omissions  regarding  their  compliance with their mandatory reporting requirements and the actions necessary to carry   out their unlawful goal of selling prescription opioids without reporting suspicious orders   or the diversion of opioids into the illicit market.

345.    In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially  false or fraudulent pretenses, representations, promises, or omissions of material facts. For  the  purpose  of executing  the  illegal  scheme,  the  RICO  Defendants  committed  these  racketeering acts,  which

number in the thousands, intentionally and knowingly with the  specific intent to advance the illegal scheme.

346.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.  Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by  sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the  purpose of executing  the unlawful scheme to design,  manufacture, market, and sell the prescription opioids by means  of false pretenses, misrepresentations, promises, and omissions;  and

b.  Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted  and/or received, materials by wire for the purpose of executing  the unlawful scheme to design, manufacture, market, and sell the  prescription opioids by  means of false pretenses, misrepresentations, promises, and omissions.

347.    The RICO Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Manufacturers, Distributors, or third parties that were foreseeably caused to be sent as a result of the RICO Defendants' illegal scheme, including but not limited to:

a.  the prescription opioids themselves;

b.  documents and communications that facilitated the manufacture,  purchase and unlawful sale of prescription opioids;

c.  Defendants' DEA registrations;

d.  documents and communications that supported and/or  facilitated Defendants' DEA registrations;

e.  documents and communications that supported and/or  facilitated       the Defendants' request for  higher aggregate production       quotas, individual   production    quotas, and  procurement quotas;

f.  Defendants' records and reports that were required to be  submitted to the DEA pursuant to 21 U.S.C. § 827;

g.  documents and communications related to the Defendants'  mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

h. documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

i. documents for processing and receiving payment for prescription opioids;

j. payments from the Distributors to the Manufacturers;

k. rebates and chargebacks from the Manufacturers to the Distributors;

l. payments to Defendants' lobbyists through the Pain Care Forum;

m. payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

n. deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and

o. other documents and things, including electronic communications.

348. On information and belief, the RICO Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce, including the following:

| Defendant Group Name | Company Name | Drugs | | |
|---|---|---|---|---|
| | | Drug Name | Chemical Name | CSA Schedule |
| Purdue | (1) Purdue Pharma, LP, (2) Purdue Pharma, Inc., (3) The Purdue Frederick Company | OxyContin | Oxycodone HCL ER | Schedule II |
| | | MS Contin | Morphine Sulfate ER | Schedule II |
| | | Dilaudid | Hydromorphone HCl | Schedule II |
| | | Dilaudid-HP | Hydromorphone HCl | Schedule II |
| | | Butrans | Buprenorpine | Schedule III |
| | | Hysingla ER | Hydrocodone Bitrate | Schedule II |
| | | Targiniq ER | Oxycodone HCl and Naloxone | Schedule II |
| Cephalon | (1) Cephalon, Inc., (2) Teva Pharmaceutical Industries, Ltd, | Actiq | Fentanyl Citrate | Schedule II |
| | | Fentora | Fentanyl Citrate | Schedule II |

| | | Generic Oxycontin | Ocycodone HCl | Schedule II |
|---|---|---|---|---|
| **Janssen** | (1) Johnson & Johnson; (2) Janssen Pharmaceuticals, Inc. (formerly (2a) *Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, formerly (2b) *Janssen Pharmaceutica, Inc.* (3) Noramco, Inc. | Duragesic | Fentanyl | Schedule II |
| | | Nucynta | Tapentadol | Schedule II |
| | | Nucynta ER | Tapentadol ER | Schedule II |
| **Endo** | (1) Endo Health Solutions Inc., (2) Endo Pharmaceuticals Inc., (3) Qualitest Phamaceuticals, Inc. | Opana ER | Oxymorphone HCl ER | Schedule II |
| | | Opana | Oxymorphone HCl | Schedule II |
| | | Percodan | Oxymorphone HCl and Aspirin | Schedule II |
| | | Percocet | Oxymorphone HCl and Acetaminophen | Schedule II |
| | | Zydone | Hydrocodone Bitartrate and Acetaminophen | Schedule III |
| **Mallinckrodt** | (1) Mallinckrodt PLC, (2) Mallinckrodt, LLC | Exalgo | Hydromorphone HCl | Schedule II |
| | | Roxicodone | Oxycodone HCl | Schedule II |
| **Actavis** | (1) Allergan Plc (2) Actavis LLC, (3) Actavis Pharma, Inc., (4) Actavis Plc, (5) Actavis, Inc., (6) Watson Pharmaceuticals, Inc., (7) Watson Laboratories, Inc., (8) Watson Pharma, Inc. | Kadian | Morphine Sulfate | Schedule II |
| | | Norco | Hydrocodone and Acetaminophen | Schedule II |
| | | Generic Duragesic | Fentanyl | Schedule II |
| | | Generic Opana | Oxymorphone HCl | Schedule II |
| **Insys** | Insys Therapeutics, Inc. | Subsys | Fentynyl | Schedule II |

349.    Purdue manufactures multiple forms of prescription opioids, including but not limited to: OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER. Purdue manufactured and shipped these prescription opioids to the  Distributor Defendants in this jurisdiction, who shipped Purdue's prescription opioids throughout this  jurisdiction.

350.    Cephalon manufactures multiple forms of prescription opioids, including but not limited to: Actiq and Fentora. Cephalon manufactured and shipped these prescription  opioids to the Distributor Defendants in this jurisdiction., who shipped  Teva's  prescription  opioids throughout this  jurisdiction.

351.    Janssen manufactures prescription opioids known as Duragesic. Janssen manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction, who shipped Janssen's prescription opioids throughout this jurisdiction.

352.    Endo manufactures multiple forms of prescription opioids, including but not limited to: Opana/Opana ER, Percodan, Percocet, and Zydone. Endo manufactured and shipped its prescription opioids to the Distributor Defendants in Kentucky, who shipped Janssen's prescription opioids throughout this jurisdiction.

353.    Actavis manufactures multiple forms of prescription opioids, including but not limited to: Kadin and Norco, as well as generic versions of the drugs known as Kadian, Duragesic and Opana. Actavis manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction, who shipped Actavis' prescription opioids throughout this jurisdiction.

354.    Mallinckrodt manufactures multiple forms of prescription opioids, including but not limited to: Exalgo and Roxicodone, who shipped Mallinckrodt's prescription opioids throughout this jurisdiction.

355.    The RICO Defendants also used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities. Specifically, the RICO Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

356.    At the same time, the RICO Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids and that they complied with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription

opioids.

357.     Plaintiff is also informed and believes that the RICO Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

358.     The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

359.     The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and the public that Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The RICO Defendants' scheme and common course of conduct was intended to increase or maintain high production quotas for their prescription opioids from which they could profit.

360.     Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. But, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

361.     The RICO Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. These actions violate 18 U.S.C. § 1962(c). Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the RICO

Defendants and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for the RICO Defendants.

362. The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

363. The RICO Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities, about the reality of the suspicious orders that the RICO Defendants were filling on a daily basis -- leading to the diversion of a tens of millions of doses of prescriptions opioids into the illicit market.

364. The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

365. For the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders.

366. The RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

367. The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants while Plaintiff was left with substantial injury to its business through the damage that the prescription opioid epidemic caused. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Opioid

Diversion Enterprise and in furtherance of its fraudulent scheme.

368.    The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other. Likewise, Defendants are distinct from the enterprise.

369.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

370.    Many of the precise dates of the RICO Defendants' criminal actions at issue here have been hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioids Addiction and Opioid Diversion Enterprise alleged herein depended upon secrecy.

371.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in this jurisdiction and the Plaintiff. Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on consumers in this jurisdiction, its citizens or the Plaintiff. In designing and implementing the scheme, at all times Defendants were cognizant of the fact that those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and reliable information regarding Defendants' products and their manufacture and distribution of those products. The Defendants were also aware that Plaintiff and the citizens of this jurisdiction rely on the Defendants to maintain a closed system and to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

372.     By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

373.     It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiff by allowing  the flow of prescriptions opioids from appropriate medical channels into the illicit drug  market.

374.     The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

375.     The RICO Defendants conducted and participated in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(D) and KRS 506.120 *et seq*. by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled  substance or listed chemical (as defined in section 102 of the Controlled Substance Act),  punishable under any law of the United States.

376.     The RICO Defendants committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 483(a)(4) makes it unlawful for any  person to knowingly or intentionally furnish false or fraudulent information in, or omit any  material information from, any application, report, record or other document required to be  made, kept or filed under this subchapter. A violation of section 483(a)(4) is punishable by up to four years in jail, making it a felony. 21 U.S.C. § 483(d)(1).

377.     Each of the RICO Defendants qualify as registrants under the CSA. Their status as registrants under the CSA requires that they maintain effective controls against diversion  of controlled substances in schedule I or II, design and operate a system to disclose to the  registrant suspicious orders of controlled substances., and inform the DEA of suspicious orders when

discovered by the registrant. 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

378.    Pursuant to the CSA and the Code of Federal Regulations, the RICO Defendants were required to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

379.    The RICO Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the DEA including the Manufacturer Defendants' applications for production quotas. Specifically, the RICO Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the DEA in their mandatory reports and their applications for production.

380.    For example, The DEA and DOJ began investigating McKesson in 2013 regarding its monitoring and reporting of suspicious controlled substances orders. On April 23, 2015, McKesson filed a Form-8-K announcing a settlement with the DEA and DOJ wherein it admitted to violating the CSA and agreed to pay $150 million and have some of its DEA registrations suspended on a staggered basis. The settlement was finalized on January 17, 2017.[167]

381.    Purdue's experience in Los Angeles is another striking example of Defendants' willful violation of the CSA and Code of Federal Regulations as it relates to reporting suspicious orders of prescription opioids. In 2016, the Los Angeles Times reported that Purdue was aware of a pill mill operating out of Los Angeles yet failed to alert the DEA.[168]  The LA Times

---

[167] McKesson, McKesson Finalizes Settlement with U.S. Department of Justice and U.S. Drug Enforcement Administration to Resolve Past Claims, About McKesson / Newsroom / Press Releases, (January 17, 2017(), http://www.mckesson.com/about-mckesson/newsroom/press-releases/2017/mckesson-finalizes-settlement-with-doj-and-dea-to-resolve-past-claims/.

[168] Harriet Ryan, et al., More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew, Los Angeles Times, (July 10, 2016),

uncovered that Purdue began tracking a surge in prescriptions in Los Angeles, including one prescriber in particular. A Purdue sales manager spoke with company officials in 2009 about the prescriber, asking "Shouldn't the DEA be contacted about this?" and adding that she felt "very certain this is an organized drug ring."[169] Despite knowledge of the staggering amount of pills being issued in Los Angeles, and internal discussion of the problem, "Purdue did not shut off the supply of highly addictive OxyContin and did not tell authorities what it knew about Lake Medical until several years later when the clinic was out of business and its leaders indicted. By that time, 1.1 million pills had spilled into the hands of Armenian mobsters, the Crips gang and other criminals."[170]

382.    Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation for its opioid practices. Specifically, in 2011, the DEA targeted Mallinckrodt arguing that it ignored its responsibility to report suspicious orders as 500 million of its pills ended up in Florida between 2008 and 2012.[171] After six years of DEA investigation, Mallinckrodt agreed to a settlement involving a $35 million fine. Federal prosecutors summarized the case by saying that Mallinckrodt's response was that everyone knew what was going on in Florida, but they had no duty to report it.[172]

---

http://www.latimes.com/projects/la-me-oxycontin-part2/.

[169] *Id.*

[170] *Id.*

[171] Lenny Bernstein & Scott Higham, <u>The government's struggle to hold opioid manufacturers accountable</u>, The Washington Post, (April 2, 2017),
https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356.
This number accounted for 66% of all oxycodone sold in the state of Florida during that time.

[172] *Id.*

383.    Plaintiff is informed and believes that the foregoing examples reflect the RICO Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74. This conclusion is supported by the sheer volume of enforcement actions available in the public record against the Distributor Defendants.[173]

384.    On April 24, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

385.    On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

386.    On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

387.    On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

388.    On January 30, 2008, the DEA issued an Order to Show Cause and Immediate

---

[173] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

Suspension Order against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of  hydrocodone;

389.    On May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement ("2008 MOA") with the DEA which provided that McKesson  would "maintain a compliance program designed to detect and prevent the diversion of  controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

390.    On September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its  Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The  document also referenced allegations by the DEA that Cardinal failed to maintain effective  controls against the diversion of controlled substances at its distribution facilities located  in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia  Facility") and Denver, Colorado ("Denver Facility");

391.    On February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center  ("Lakeland Facility") for failure to maintain effective controls against diversion of  oxycodone;

392.    On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its  Lakeland, Florida Distribution Center; and

393.    On January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150,000,000 civil  penalty for violation of the 2008 MOA as well as failure to identify and report suspicious  orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL,  Landover MD, La

Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington  Courthouse OH and West Sacramento CA.

394.    These actions against the Distributor Defendants confirm that the Distributors knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA. These  actions also demonstrate, on information and belief, that the Manufacturer Defendants were   aware of the enforcement against their Distributors and the diversion of the prescription  opioids and a corresponding duty to report suspicious orders.

395.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless  enjoined by this Court.

396.    Many of the precise dates of Defendants' criminal actions at issue herein were hidden and cannot be alleged without access to Defendants' books and records. Indeed, an  essential part of the successful operation of the Opioid Diversion Enterprise depended upon  the secrecy of the participants in that enterprise.

397.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had  similar results affecting similar victims, including consumers in this jurisdiction and the  Plaintiff. Defendants calculated and intentionally crafted the diversion scheme to increase  and maintain profits from unlawful sales of opioids, without regard to the effect such  behavior would have on this jurisdiction, its citizens or the Plaintiff. The Defendants were aware that Plaintiff and the citizens of this jurisdiction rely on the Defendants to maintain  a closed system of manufacturing and distribution to protect against the  non-medical  diversion and use of their dangerously addictive opioid drugs.

398.    By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

399.    It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations would harm Plaintiff by allowing the flow of prescriptions opioids from appropriate medical channels into the illicit drug market.

400.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

401.    At all relevant times, the RICO Defendants were associated with the Opioid Diversion Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity.

402.    Defendants conspired, as alleged more fully above, by conducting the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity.

**D.    Damages**

403.    The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property because Plaintiff paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference.

404.    Plaintiff's injuries, and those of its citizens, were proximately caused by Defendants' racketeering activities. But for the RICO Defendants' conduct, Plaintiff would not have paid the health services and law enforcement services and expenditures required as a result of the plague of drug-addicted residents.

405.    Plaintiff's injuries and those of its citizens were directly caused by the RICO

Defendants' racketeering activities.

406.     Plaintiff was most directly harmed and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

407.     Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

**COUNT III**
**NEGLIGENCE**
**(Against All Defendants)**

408.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully  set forth herein, and further alleges as follows.

409.     Plaintiff seeks economic damages which were the foreseeable result of Defendants' intentional and/or unlawful actions and omissions.

410.     Under State law, to establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty, and injury resulting proximately therefrom.  All such essential elements exist here.

411.     Each Defendant had an obligation to exercise reasonable care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs to the Commonwealth of Kentucky and Inez.

412.     Each Defendant had an obligation to exercise due care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs in the Commonwealth of Kentucky and Inez.

413.     The existence of a duty depends on the foreseeability of the injury. Each Defendant owed a duty to the Plaintiff because the injuries alleged  herein was foreseeable, and in fact foreseen, by the Defendants.

414.    Reasonably prudent manufacturers and distributors of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities,  and the significant costs which would be imposed upon the governmental entities  associated with those communities. The closed system of opioid distribution whereby  wholesale distributors are the gatekeepers between manufacturers and pharmacies, and  wherein all links in the chain have a duty to prevent diversion, exists for the purpose of  controlling dangerous substances such as opioids and preventing diversion and abuse.

415.    Reasonably prudent manufacturers of pharmaceutical products would know that aggressively pushing highly addictive opioids for chronic pain would result in the severe  harm of addiction, foreseeably causing patients to seek increasing levels of opioids, frequently turning to the illegal drug market as a result of a drug addiction that was foreseeable to the Manufacturer Defendants.

416.    Moreover, Defendants were repeatedly warned by law enforcement of the unlawfulness and consequences of their actions and omissions.

417.    The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were  not being served.

418.    Distributor  Defendants breached their duties to exercise due care in the business of wholesale  distribution of dangerous opioids, which are Schedule II Controlled Substances, by failing  to monitor for, failing to report, and filling highly suspicious orders time and again. Because the very purpose of these duties was to prevent the resulting harm – diversion of  highly addictive drugs for non- medical purposes – the causal connection between  Defendants' breach of duties and the ensuing harm was entirely foreseeable.

419.    Distributor Defendants misrepresented their compliance with their duties under the

law and concealed their noncompliance and shipments of suspicious orders of opioids to the Commonwealth of Kentucky and Inez and destinations from which they knew opioids were likely to be diverted into the City of Savanah, in addition to other misrepresentations alleged and incorporated herein.

420. Manufacturer Defendants breached their duties to exercise due care in the business of pharmaceutical manufacturers of dangerous opioids, which are Schedule II Controlled Substances, and by misrepresenting the nature of the drugs and aggressively promoting them for chronic pain for which they knew the drug were not safe or suitable.

421. The Manufacturer Defendants misrepresented and concealed the addictive nature of prescription opioids and its lack of suitability for chronic pain, in addition to other misrepresentations alleged and incorporated herein.

422. All Defendants breached their duties to prevent diversion and report and halt suspicious orders, and all Defendants misrepresented their compliance with their legal duties.

423. Defendants' breaches were intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

424. The causal connection between Defendants' breaches of duties and misrepresentations and the ensuing harm was entirely foreseeable.

425. As described above in language expressly incorporated herein, Defendants' breaches of duty and misrepresentations caused, bears a causal connection with, and/or proximately resulted in the damages sought herein.

426. Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Defendants' knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific, or industrial channels. However, Defendants breached their duties to monitor for,

report, and halt suspicious orders, breached their duties to prevent diversion, and, further, misrepresented what their duties were and their compliance with their legal duties.

427.    Defendants' unlawful and/or intentional actions create a rebuttable presumption of negligence under State law.

428.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' actions and omissions. Plaintiff does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

429.    Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including inter alia injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT IV
## NEGLIGENCE PER SE
### (Against Distributor Defendants)

430.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

431.    Each Defendant had a duty under, *inter alia*, this law to maintain effective controls against diversion of prescription opioids and to guard against, prevent, and report suspicious orders of opioids.

432.    Defendants' violation of the law constitutes negligence *per se*.

433.    Defendants' actions and omissions were intentional and/or unlawful, and Defendants acted with actual malice.

434.    It was foreseeable that the breach of duty described herein would result in the economic damages for which Plaintiff seeks recovery.

435.    As described above in language expressly incorporated herein, Defendants breached their duties to maintain effective controls against diversion of dangerously addictive opioids, including violating public safety statutes requiring that as wholesale drug  distributors, Defendants could only distribute these dangerous drugs under a closed system - a system Defendants were responsible for guarding.

436.    As described above in language expressly incorporated herein, Defendants' breach of statutory and regulatory duties caused, bears a causal connection with, and proximately  resulted in, harm and damages sought by the Plaintiff.

437.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' negligence per se. Plaintiff does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

438.    Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including inter alia injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Distributor Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT V
## DECEPTIVE TRADE PRACTICES
### KRS 367.110, et seq.,
### (Against All Defendants)

439.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully  set forth herein, and further alleges as follows.

440.    Defendants violated KRS 367.110, *et. seq.,* because they engaged in  deceptive trade practices in this State.

441.    Defendants committed repeated and willful unfair or deceptive acts or practices,

and unconscionable trade practices, in the conduct of commerce.

442.    Each Defendant represented that opioids had certain characteristics, approvals, uses, and benefits that were false and failed to report and/or prevent the diversion of highly  addictive prescription drugs to illegal sources.

443.    Because of the dangerously  addictive nature of these drugs, the Defendants' manufacturing, marketing, sales, and/or distribution practices unlawfully caused an opioid  and heroin plague and epidemic in the Commonwealth of Kentucky and Inez. Each Defendant  had a non-delegable duty to guard against and prevent the diversion of prescription opioids to other than legitimate medical, scientific, and industrial channels.

444.    The Defendants also omitted material facts, causing confusion or misunderstanding as to approval or certification of goods or services.

445.    The Defendants failed to disclose the material facts that inter alia they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addiction and severe harm, and specifically monitor, investigate,  report, and refuse suspicious orders. But for these material factual omissions, Defendants  would not have been able to sell opioids, and the Distributor Defendants would not have been able to receive and renew licenses to sell opioids.

446.    Each Manufacturer Defendant wrongfully represented that the  opioid prescription medications they manufactured, marketed, and sold had characteristics,   uses, or benefits that they do not have.

447.    The Manufacturer Defendants also wrongfully misrepresented that the opioids were safe and effective when such representations were untrue, false, and misleading.

448.    The Manufacturer Defendants also used exaggeration and/or ambiguity as to material facts and omitted material facts, which tended to deceive and/or did in fact deceive.

449.     Because of the dangerously addictive nature of these drugs, which the Manufacturer Defendants concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, Defendants' sales and marketing of opioids constituted a violation of State law.

450.     The Manufacturer Defendants made deceptive representations about the use of opioids to treat chronic non-cancer pain. Each Manufacturer Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

451.     Defendants' unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to deceive the Plaintiff.

452.     As described more specifically above, Defendants' representations, concealments, and omissions constitute a willful course of conduct which continues to this day.

453.     State law prohibits representing that goods or services have sponsorship, approval, characteristics, uses, or benefits that they do not have. State law further prohibits representing that goods are of a standard, quality, or grade if they are of another.

454.     Defendants committed repeated and willful unfair or deceptive acts or practices, and unconscionable trade practices, in the conduct of commerce in this State.

455.     Each Defendant failed to report and/or prevent the diversion of highly addictive prescription drugs.

456.     Because of the dangerously addictive nature of these drugs, the Distributor Defendants' manufacturing, marketing, sales, and distribution practices unlawfully caused an opioid and heroin plague and epidemic in the Commonwealth of Kentucky and Inez. Each Defendant had a non-delegable duty to guard against and prevent the diversion of

prescription opioids to other than legitimate medical, scientific, and industrial channels.

457.    The Defendants also omitted material facts, causing confusion or misunderstanding as to approval or certification of goods or services.

458.    The Defendants failed to disclose the material facts that inter alia they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addiction and severe harm, and specifically monitor, investigate,  report, and refuse suspicious orders. But for these material factual omissions, Defendants would not have been able to sell opioids, and the Distributor Defendants would not have been able to receive and renew licenses to sell opioids.

459.    Each Manufacturer Defendant wrongfully represented that the  opioid prescription medications they manufactured, marketed, and sold had characteristics, uses, or benefits that they do not have.

460.    The Manufacturer Defendants also wrongfully misrepresented that the opioids were safe and effective when such representations were untrue, false, and misleading.

461.    The Manufacturer Defendants also used exaggeration and/or ambiguity as to material facts and omitted material facts, which had a tendency to deceive and/or did in  fact deceive.

462.    Because of the dangerously addictive nature of these drugs, which the Manufacturer Defendants concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, Defendants' sales and marketing of opioids constituted a violation of State law.

463.    The Manufacturer Defendants made deceptive representations about the use of opioids to treat chronic non-cancer pain. Each Manufacturer Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about  the

risks and benefits of opioids. Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

464.    Defendants acted intentionally and/or unlawfully.

465.    Plaintiff seeks an injunction preventing Defendants from continuing to make statements in violation of KRS 367.110, *et seq.*

## COUNT VI
## FALSE STATEMENT IN ADVERTISING
### (Against All Defendants)

466.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

467.    Defendants' efforts to market and sell opioids in Inez as identified in this Complaint, caused false information to be disseminated by publication, advertising, and other means statements regarding opioids that were fraudulent or untrue.

468.    Defendants knew, or through the exercise of reasonable care should have known, that statements made in marketing opioids in Inez were untrue.

469.    Plaintiff seeks injunctive relief to cause the cessation of Defendants' false advertising and marketing.

## COUNT VII
## VIOLATION OF LEGAL DUTY
### (Against Distributor Defendants)

470.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

471.    The Distributor Defendants failed to disclose suspicious sales of opioids as required by federal law (21 U.S.C. § 823, 21 CFR 1301.74).

472.    Distributor Defendants' failure to disclose suspicious sales of opioids resulted in injury to Plaintiff.

473.     The purpose of the disclosure requirement for suspicious sales of opioids is to alert governing agencies and governments to the potential for abuse and harm resulting from large quantities of opioids within a community.

474.     Plaintiff falls within the class of persons that 21 U.S.C. § 823, 21 CFR 1301.74 were intended to protect.

475.     The expense incurred by Plaintiff in combating the opioid epidemic is the harm that the reporting requirements of 21 U.S.C. § 823, 21 CFR 1301.74were intended to guard against.

476.     Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' tortious activity.

477.     Plaintiff seeks all legal and equitable relief as allowed by law.

## COUNT VIII
## PUNITIVE DAMAGES

478.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

479.     Defendants' conduct, as set forth herein above, showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which raises the presumption of conscious indifference to the consequences. Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the jury.

480.     Defendants' conduct, as set forth herein above, evidenced a specific intent to cause harm, as defined by law, to Plaintiff. Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the jury, not subject to any cap or limit.

**WHEREFORE**, Inez requests a trial by jury and prays that the Court grant the following relief:

    a.   Judgment in favor of the Plaintiff and against each Defendant;

b. An award of compensatory damages in an amount sufficient to fully and fairly compensate Plaintiff for all damages alleged herein;

c. An award for restitution and/or disgorgement of Defendants' unjust enrichment, benefits, and ill-gotten gains, plus interest, acquired as a result of the Defendants' unlawful conduct as alleged herein;

d. An award of treble damages, attorneys' fees, and all costs and expenses of litigation pursuant to Plaintiff's racketeering claims against Defendant;

e. A finding that as a result of Defendants' acts and omissions as alleged herein, Defendants have created a public nuisance, and an order directing Defendants to abate and pay damages for the public nuisance;

f. An injunction permanently enjoining Defendants from engaging in the acts and omissions that caused the public nuisance;

g. A finding that as a result of Defendants' acts and omissions as alleged herein, Defendants violated the Kentucky Consumer Protection Act and Kentucky laws regarding False Statement in Advertising, and an award for damages related thereto;

h. An award of punitive damages against Defendants in an amount sufficient to punish Defendants and deter Defendants from engaging in such wrongful and unlawful conduct in the future;

i. An award of all costs of this action including attorneys' fees and expenses of litigation;

j. An award of pre-judgment and post-judgment interests; and

k. Such other and further relief as the Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Respectfully submitted,

/s/ *Mark P. Bryant*
Mark P. Bryant
Emily Ward Roark
**BRYANT LAW CENTER, PSC**
601 Washington Street
Paducah, KY 42003
Office Phone: (270) 442-1422
mark@bryant.law
emily@bryant.law

/s/ David G. Bryant
David G. Bryant
**DAVID BRYANT LAW, PLLC**
600 West Main Street
Suite 100
Louisville, KY 40202
Office Phone: (502) 540-1221
Email: david@davidbryantlaw.com

/s/ Jeff Friedman
Jeff Friedman (asb-6868-n77j)
**FRIEDMAN, DAZZIO, ZULANAS &
BOWLING, P.C.**
3800 Corporate Woods Drive
Birmingham, AL 35242
jfriedman@friedman-lawyers.com

/s/ Matt Conn
Matt Conn (asb-9628-t83c)
Friedman, Dazzio, Zulanas & Bowling, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
mconn@friedman-lawyers.com

**Attorneys for Plaintiff**